857 F.2d 137
 UNITED STATES of America, Appellee,
v.
Kenneth P. ZAUBER, Appellant at Nos. 87-5292 and 88-5244.
UNITED STATES of America, Appellee,
v.
Robert COAR, Appellant at Nos. 87-5293 and 88-5245.
UNITED STATES of America, Appellee,
v.
Frank SCOTTO, Appellant at Nos. 87-5294 and 88-5246.
 Nos. 87-5292 to 87-5294 and 88-5244 to 88-5246.
 United States Court of Appeals,
Third Circuit.
 Argued April 13, 1988.
Decided Aug. 31, 1988.
As Amended on Denial of Rehearing and Rehearing In Banc Nov. 10, 1988.
 
 Roanne L. Mann (argued), Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, for appellant Kenneth P. Zauber.
 Michael R. Perle (argued), Hayden & Perle, Hoboken, N.J., for appellant Robert Coar.
 Robert E. Margulies (argued), Clifford A. Herrington, Margulies, Wind, Herrington & Katz, Jersey City, N.J., for appellant Frank Scotto.
 Samuel P. Moulthrop, Chief, Appeals Div., Marion Percell, Asst. U.S. Atty. (argued), Newark, N.J., for appellee.
 Before BECKER, HUTCHINSON and SCIRICA, Circuit Judges.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 I. INTRODUCTION
 
 1
 Appellants Robert Coar and Frank Scotto were indicted,[1] tried and convicted of mail and wire fraud pursuant to 18 U.S.C.A. Secs. 1341 (West 1984) and 1343 (West 1984) and of conspiring to violate 18 U.S.C.A. Sec. 1962(c) (West 1984) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C.A. Sec. 1962(d) (West 1984) in the United States District Court for the District of New Jersey. Appellant Kenneth P. Zauber was convicted of mail fraud, RICO conspiracy and accepting kickbacks in connection with an employee pension benefit plan in violation of 18 U.S.C.A. Sec. 1954 (West 1984) in the same court. All three were tried together. The district court denied their acquittal and new trial motions and sentenced them to prison terms and $25,000 fines. After they filed their appeal, the Supreme Court issued its decision in McNally v. United States, --- U.S. ----, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Although McNally was not considered by the district court, we are bound to consider it on appeal. United States v. Asher, 854 F.2d 1483, 1487 (3d Cir.1988); see also Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) (new constitutional rules to be applied retroactively to all criminal cases on direct review or not otherwise final, with no exception when new rule is "clear break" with past). Because we find that the indictment fails to sufficiently allege mail and wire fraud violations under McNally, we will vacate appellants' mail and wire fraud convictions and dismiss those portions of the indictment that charge Secs. 1341 and 1343 violations. As to the remaining RICO conspiracy and Sec. 1954 convictions, we will affirm and remand to the district court for resentencing.
 
 II. FACTS
 
 2
 Coar and Scotto were lifetime trustees of the International Brotherhood of Teamsters, Local 701's employee pension benefit plan ("pension fund"). Zauber replaced David Friedland as general counsel to the pension fund in 1979.[2] Friedland was convicted in 1980 of receiving kickbacks in connection with a loan of pension fund monies.
 
 
 3
 In the spring of 1982, Friedland and Joseph Higgins[3] agreed to try to obtain money from the pension fund to invest in Higgins's Omni Funding Group ("Omni"), a Florida-based mortgage company.[4] Because of his earlier conviction, Friedland was to be a hidden partner in Omni. Friedland told Higgins that he would discuss the matter with Coar and Scotto, who trusted him. Friedland later reported back to Higgins they would have to pay kickbacks to Coar and Scotto to obtain the money.
 
 
 4
 Higgins mailed an investment proposal to the pension fund in June, 1982. His letter was the basis for a mail fraud count against Friedland, Coar and Scotto. After a formal presentation, Higgins and the trustees entered into negotiations. Zauber conducted a superficial "due diligence" investigation into Higgins and Omni, and reported favorably on them. At some point pension fund manager Alfred Piperata became suspicious of Higgins and conducted his own investigation. His inquiry revealed Higgins's prior bankruptcy, IRS and repossession problems, as well as his long-time friendship with David Friedland. When Piperata expressed concern to the appellants, he was told not to worry about it.
 
 
 5
 Higgins testified that sometime after the presentation, he, Friedland, Coar and Scotto had a meeting at a New York restaurant called "Paul and Jimmy's." The purpose of this meeting was to give Coar and Scotto an opportunity to "look over" Higgins and discuss the Omni investment in general.
 
 
 6
 In October, 1982, Higgins and the pension fund entered into a formal contract. The pension fund agreed to transfer $20,000,000, presently invested with the Magten Asset Management Corporation ("Magten"), to Omni for a thirty-year period. On this investment the pension fund was to set a return 1% higher than the six-month treasury bill rate on residential mortgages and 2% over the treasury rate on commercial mortgages. Omni was to retain any profit above those rates. Commercial loans using pension funds could not exceed 10% of the corpus. Residential loans were to require 100% insurance, and commercial loans 15% insurance. The contract also contained express provisions barring individuals with prior convictions, like David Friedland, from any involvement in Omni. Zauber's fiance, an associate at a Wall Street law firm, "independently" reviewed the contract.
 
 
 7
 The $20,000,000 was transferred to Omni in two separate transactions, $15,000,000 by wire and $5,000,000 by mail. These transactions formed the basis for mail and wire fraud counts against Friedland, Coar and Scotto.
 
 
 8
 In late November, 1982, Omni was having trouble obtaining insurance on the loans. Higgins proposed changing the investment contract to allow for a 15% holdback on each loan in lieu of insurance or a letter of credit. By letter of December 6, 1982, Zauber approved Higgins's proposed interpretation of the contract. This letter was the basis of a mail fraud count against Zauber and Friedland.
 
 
 9
 Higgins testified that he, Coar, Scotto and Friedland had a second lunch meeting at "Paul and Jimmy's" sometime in late 1982. At that meeting, Friedland requested that all communications between Omni and Coar and Scotto be made through him, rather than Higgins. Friedland also discussed kickbacks and told Coar and Scotto that their share would come from his half of Omni's profits.
 
 
 10
 At trial, Higgins testified that Zauber approached him for money on at least six separate occasions beginning in late 1982.[5] Higgins repeatedly directed Zauber to Friedland and gave Friedland money to pay off Zauber, Coar and Scotto.[6]
 
 
 11
 In January of 1983, four new trustees joined Coar and Scotto on the board of the pension fund.[7] The new trustees were told that the "old" trustees would be solely responsible for any liability on prior investments and would continue to monitor them. In late 1983, however, the new trustees learned this was incorrect and became aware of their own responsibility, as fiduciaries, for continuing investments made by the fund. They also learned that the Magten investment was paying 17% while Omni was paying approximately 9% overall. The new trustees began their own investigation into Omni. After a trip to Florida to learn more about Omni, they discovered that Omni had been violating the investment contract by making loans in excess of the 10% corpus limit. Higgins, Friedland and Zauber attempted to cover up these loans by backdating a letter from Zauber authorizing loans in excess of the 10% limit. The new trustees also discovered that many of Omni's loans were in default, and that Omni was making interest payments to the pension fund from the 15% holdback accounts in violation of the investment contract. After the Department of Labor initiated an investigation, Coar and Scotto resigned from the board, Zauber was fired, and the new trustees terminated the pension fund's investment contract with Omni.
 
 III. THE McNALLY ISSUES
 A.
 
 12
 The mail fraud statute, 18 U.S.C.A. Sec. 1341, provides, in pertinent part:
 
 
 13
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting to do so, [mails, receives in the mail or causes the mails to be used] shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 
 
 14
 The wire fraud statute, 18 U.S.C.A. Sec. 1343, employs similar language and applies to the use of transmissions by wire, radio, or television communication in interstate or foreign commerce to further a scheme to defraud.[8] Because the district court did not review the indictment for a McNally deficiency, our standard of review is plain error. Fed.R.Crim.P. 52(b). The same standard of review and analysis apply to both fraud statutes. Carpenter v. United States, --- U.S. ----, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987); United States v. Evans, 844 F.2d 36, 37 (2d Cir.1988).
 
 
 15
 On review of defendants' mail and wire fraud convictions, we must look to see whether the indictment alleged, and the jury was charged, that the defendants schemed to defraud the pension fund of tangible property. McNally, 107 S.Ct. at 2882; Asher, 854 F.2d at 1496. The government need not, of course, prove that the scheme was successful in order to sustain a conviction for mail fraud. United States v. Pearlstein, 576 F.2d 531, 542 (3d Cir. 1978). Allegations of lost "intangible" rights are insufficient, without more, to support an indictment charging violations of the mail and wire fraud statutes. Intangible rights include the public's right to have government officials perform their duties honestly. McNally, 107 S.Ct. at 2881. They also include an employer's right to the honest and faithful services of its employees. Purely intangible rights are contrasted with rights in intangibles which nevertheless constitute "property." See Carpenter, supra (newspaper's financial information, misappropriated by reporter prior to publication, constituted loss of property to newspaper for purpose of mail and wire fraud statutes).
 
 B.
 
 16
 We first review the indictment to see if it charged the defendants with committing acts which caused a money or property loss to the pension fund. The redacted indictment[9] contains six counts. Count One alleges a RICO conspiracy, based on predicate acts of mail and wire fraud and Sec. 1954 kickback violations, involving all of the defendants. Counts Two through Five involve substantive mail and wire fraud charges. Count Six charges Zauber with a violation of 18 U.S.C.A. Sec. 1954, receiving kickbacks with intent to be influenced with respect to an employee benefit plan. The indictment is set out in its entirety in the Appendix to this opinion.
 
 
 17
 Count One paragraphs (2)(a) and (b) charge the defendants with conspiring "to defraud the Pension Fund and its Beneficiaries of money and property and of the right to honest, faithful, prudent and diligent services by its employees--all relating to the Pension Fund's dealings with Omni, and to the manner in which Omni would invest and otherwise handle said $20,000,000 in Pension Fund assets," in violation of 18 U.S.C.A. Secs. 1341 and 1342. Paragraph (3) charges that this conspiracy was carried out by accepting kickbacks from Omni profits, acquiescing in Friedland's illegal participation in Omni, concealing the holdback accounts and delinquent loans from the pension fund, issuing loans in excess of the 10% lending limit without pension fund approval, and in general making expressly prohibited and otherwise imprudent loans and then "thwarting discovery" by trying to cover up their tracks from the new trustees. There is no allegation of an actual money or property loss to the fund itself.
 
 
 18
 Count One paragraph (4) describes the racketeering acts which made up the conspiracy. These acts consisted of the mail and wire fraud charges, also charged separately in Counts Two through Five, and the Sec. 1954 violations. Here, however, the government only charges the defendants with a scheme "to defraud the Pension Fund, and the beneficiaries thereof, of the right to honest, faithful[,] prudent and diligent services by the Pension Fund's fiduciaries and employees." See Count One paragraphs (4)(1)(a), (b), (4)(2)(a) and (4)(3)(a). Paragraph (4) does not allege a money or property loss to the fund.
 
 C.
 
 19
 In construing an indictment, we will not strain to interpret a defective indictment as implicitly alleging that the kickback scheme's purpose was to deprive the pension fund beneficiaries of money. United States v. Davis, No. 88-4076 (6th Cir. March 8, 1988) [841 F.2d 1127 (table)] Text available on WESTLAW, 1988 WL 19175 (per curiam) (citing United States v. Heller, 579 F.2d 990, 999 (6th Cir.1978)). In United States v. Baldinger, 838 F.2d 176 (6th Cir.1988), the United States Court of Appeals for the Sixth Circuit considered whether an indictment alleging that the defendant acted to discredit a competitor's business qualifications, thereby defrauding the competitor " 'of [its] right to conduct business free of false, fictitious and fraudulent information,' " constituted a violation of the mail fraud statute under McNally. On appeal the government argued that its theory really involved an appropriation of the competitor's "good will," a valid intangible property right within Carpenter. Id. at 179. Although the Sixth Circuit found some evidence supporting this theory on which the jury could have based its verdict, the indictment itself was dismissed because it failed to allege such a theory:
 
 
 20
 One of the principal purposes of an indictment is to inform the defendant of that which he is called upon to defend. The indictment here gave no warning ... that [the defendant] might be accused of appropriating [the victim's] good will. It is therefore obvious that it would be unduly prejudicial to [the defendant] to uphold his conviction on an economic benefit ground when this issue was not fully presented at trial.
 
 
 21
 Baldinger, 838 F.2d at 181.
 
 
 22
 Counts Two through Five, the mail and wire fraud violations, incorporate the RICO conspiracy count by reference and charge the defendants with scheming to defraud the pension fund "of the right to honest, faithful[,] prudent and diligent services of [its] employees." These counts do not allege a money or property loss to the pension fund; instead, they rely solely on the loss of intangible rights. Under McNally Counts Two through Five fail to charge the defendants with conduct violating 18 U.S.C.A. Secs. 1341 and 1343. They are insufficient and must be dismissed. See United States v. Markus, 721 F.2d 442, 444 (3d Cir.1983) (each count in indictment is separate); see also United States v. Fulcher, 626 F.2d 985, 988 (D.C.Cir.1980) ("Each count must stand on its own, and cannot depend for its validity on the allegations of any other count not specifically incorporated."), cert. denied, 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980). "It is settled law that 'nothing can be added to an indictment without the concurrence of the grand jury by which the bill was found.' " Markus, 721 F.2d at 444 (quoting United States v. Norris, 281 U.S. 619, 622, 50 S.Ct. 424, 425, 74 L.Ed. 1076 (1930)).
 
 D.
 
 23
 This leaves us with those parts of Count One's RICO conspiracy charge which are based on predicate acts of mail and wire fraud.[10] Count One does allege a scheme to defraud the pension fund of money or property in general terms. Count One p 2(a), (b). "In order to be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating." United States v. Gimbel, 830 F.2d 621, 624 (7th Cir.1987). In United States v. Castor, 558 F.2d 379, 385 (7th Cir.1977), cert. denied, 434 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752 (1978), the United States Court of Appeals for the Seventh Circuit held that the government need not allege evidence showing a causal relation between the alleged mailings and the scheme to defraud for the indictment to stand. Such "subordinate" evidence need not be included in the indictment "unless there is no conceivable evidence that the Government could produce at trial to substantiate its [causation] allegation." Id.
 
 
 24
 In this case, if the government had presented the grand jury with charges based on a money or property loss theory, and presented the grand jury with evidence to support that theory, we might be persuaded that the indictment for RICO conspiracy insofar as it was based on predicate acts of mail and wire fraud was sufficient, even without allegations of actual money or property losses to support the theory. However, we have carefully reviewed the government's submissions and find no indication that it proceeded on such a theory. It is clear that the grand jury indicted the defendants for scheming to deprive the pension fund of its right to its employees' "honest, faithful, prudent and diligent services" by receiving kickbacks. Furthermore, the government conceded at oral argument that it was impossible, even at the time of trial, to know whether the pension fund suffered any actual losses.
 
 
 25
 As we stated in our recent opinion in Asher, post-McNally cases can be separated into those where the convictions were upheld because the fraudulent scheme resulted in a money or property loss and those where the conviction was based entirely on an intangible rights theory and the jury instructions "could not assure that money or property interests were implicated," necessitating a reversal under McNally principles. Asher, 854 F.2d at 1490. This case is in the latter category. Although Count One of the indictment alleges a money or property loss, it is clear that the mail and wire fraud charges were based, and the jury solely instructed on, an intangible rights theory.
 
 
 26
 Our conclusion is supported by the trial and jury charge in this case. Review of the record demonstrates that the government's theory throughout the trial was that the defendants committed mail and wire fraud by scheming to defraud the pension fund by receiving kickbacks from Omni's profits. We find no evidence that the government could or did show that the pension fund lost money, either from its corpus or Omni's guaranteed rate of return. There was also no evidence that use of the holdback accounts to pay interest or any of the failed loans caused a loss to the pension fund.
 
 
 27
 Even more revealing are the government's requests to charge and the jury charge itself. The government's requested charges for the mail and wire fraud statutes deleted the "or for obtaining money and property" language and simply read, "Whoever, having devised or intending to devise any scheme or artifice to defraud, ... for the purpose of executing such scheme." Jt.App. at 811. The scheme to defraud involved "defrauding of the Pension Fund of its right to the honest and faithful services of the defendants." Id. at 814. That scheme, the charge alleged, constituted a crime under the mail and wire fraud statutes. Id.
 
 
 28
 At the charging conference, in defense of the requested charges, counsel for the government Stanley R. Chesler argued that a kickback scheme is an intangible rights fraud:
 
 
 29
 MR. CHESLER: Now we have mail frauds based upon kickbacks, also.
 
 
 30
 MR. HAYDEN: (representing defendant Coar): We're not talking about intangible rights. It's not in your indictment.
 
 
 31
 MR. CHESLER: It certainly is intangible rights.
 
 
 32
 MR. HAYDEN: Your indictment is kickback scheme, you can't change your indictment. That's the indictment we're trying.
 
 
 33
 It's kickback scheme, Stanley.
 
 
 34
 MR. CHESLER: A kickback scheme is still an intangible rights fraud.
 
 
 35
 Id. at 947.
 
 
 36
 Finally, our review of the district court's jury charge reveals that the jury was never asked to find a money or property loss under the indictment:
 
 
 37
 In order to establish a scheme to defraud, the government is not required to establish that the defendant himself originated the scheme to defraud. Nor is it necessary that a defendant realize any gain from the scheme, nor that the intended victim suffered any loss.
 
 
 38
 * * *
 
 
 39
 Members of the jury, there was some mention ... as to the victims, victims of the alleged crimes charged here as being the pensioners of the Local 701 pension fund. I hereby charge you that it is absolutely irrelevant whether or not there was any loss in pension benefits, as well as whether or not the pension fund is presently financially strong. The sole issue before you is whether or not the defendants have been proven guilty of the crimes charged beyond a reasonable doubt.
 
 
 40
 Id. at 1009, 1020 (emphasis added).
 
 
 41
 This case is therefore distinguishable from United States v. Piccolo, 835 F.2d 517 (3d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). In Piccolo we concluded that the district court's jury instruction[11] implicitly required the jury to find that the object of the scheme was to defraud the victim of money before it could find that the victim was also defrauded of its right to the honest, faithful and loyal services of its employee. Piccolo, 835 F.2d at 520. Since the district judge instructed the jury that the government must prove both beyond a reasonable doubt, we found no reversible error. Unlike Piccolo, in this case the jury was clearly instructed solely on an intangible rights theory. The record convinces us that, despite the "money or property loss" language in Count One of the indictment, that indictment did not, and in fact could not, charge an actual money or property loss to the pension fund caused by the defendants.
 
 E.
 
 42
 The government makes a vain effort to preserve Counts Two through Five of the indictment as well as the parts of Count One which are predicated on mail and wire fraud. These charges were crafted long before the Supreme Court's decision in McNally.
 
 
 43
 They first argue that the kickbacks constituted a loss of property to the pension fund. Although the money for the kickbacks came from Omni investment profits, the government argues that the defendants had a fiduciary duty to turn over any bribe to the principal, since that bribe is of value to the principal and therefore the taking of such a bribe is the taking of something of benefit to the principal. The government relies heavily on United States v. Runnels, 833 F.2d 1183 (6th Cir.1987). That case, which relied on a constructive trust theory to show a money loss, has since been vacated pending rehearing en banc. See United States v. Runnels, 842 F.2d 909, 912 (6th Cir.1988) (order granting rehearing en banc and vacating previous opinion and judgment). Recent Sixth Circuit decisions intimate that the Runnels fiduciary duty theory is in trouble. See United States v. Davis, supra (remanded to dismiss indictment for failure to charge deprivation of money or property); see also United States v. Baldinger, supra (same). Moreover, the constructive trust theory has been flatly rejected by the Seventh Circuit; see United States v. Holzer, 840 F.2d 1343, 1347-49 (7th Cir.1988). We too reject it as inconsistent with McNally.
 
 F.
 
 44
 Again, with respect to Counts Two through Five and the parts of Count One predicated on mail and wire fraud, the government argues that the pension fund suffered an actual loss due to missed investment opportunities. It argues that the Omni investment realized only half as much as the pension fund monies handled by Magten, and that defendants' removal of $20,000,000 of pension fund monies from Magten and subsequent investment of that money in Omni caused an actual loss of many hundreds of thousands of dollars to the pension fund.[12]
 
 
 45
 The problem with this argument is that although the Omni investment may have been unwise, it still returned exactly what the investment agreement called for: a 2% return over the six month treasury bill rate on commercial mortgages and 1% over the treasury bill rate on residential mortgages. There is no evidence that Omni failed to pay the guaranteed return. We fail to see how the defendants could have predicted such a large scale drop in the treasury bill rate. Unlike Asher, the record here does not show that a better deal was available when the trustees made the Omni investment.
 
 G.
 
 46
 Finally, with respect to mail and wire fraud, the government argues that the defendants deprived the pension fund of control over its money. It argues that a deprivation of control over how money is spent can constitute an actual loss of money or property. It cites McNally and Carpenter in support of this argument.
 
 
 47
 In McNally one of the defendants, a public official responsible for selecting insurance agencies for the state of Kentucky's insurance needs, received commissions from the insurance companies. In reversing defendants' mail fraud convictions, the Supreme Court observed that the jury was not:
 
 
 48
 charged that to convict it must find that the Commonwealth was deprived of control over how its money was spent. Indeed, the premium for insurance would have been paid to some agency, and what [defendants] did was to assert control that the Commonwealth might not otherwise have made over the commissions paid by the insurance company to its agent.
 
 
 49
 McNally, 107 S.Ct. at 2882. The Court further observed:It may well be that Congress could criminalize using the mails to further a state officer's efforts to profit from governmental decisions he is empowered to make or over which he has some supervisory authority, even if there is no state law proscribing his profiteering or even if state law expressly authorized it. But if state law expressly permitted or did not forbid a state officer such as [defendant] to have an ownership interest in an insurance agency handling the State's insurance, it would take a much clearer indication than the mail fraud statute evidences to convince us that having and concealing such an interest defrauds the State and is forbidden under federal law.
 
 
 50
 Id. at 2882 n. 9. The opinion can be read as dismissing the loss of control argument on the narrow ground that the jury was not instructed that it could convict the defendants under such a theory. Footnote nine suggests, however, that such a theory is too amorphous to constitute a violation of the mail fraud statute as it is currently written.
 
 
 51
 In Carpenter the Supreme Court held that a reporter's use of his newspaper's confidential information for his own personal gain violated the mail and wire fraud statutes. In that case the petitioner argued that his use of prepublic information was merely a violation of workplace rules and did not constitute fraudulent activity within the meaning of the mail fraud statute. The Supreme Court looked to the following definitions and concluded that petitioner's use of the Wall Street Journal's prepublic information was fraud:
 
 
 52
 As we observed last Term in McNally, the words "to defraud" in the mail fraud statute have the "common understanding" of " 'wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.' " 483 U.S. at ----, 107 S.Ct., at 2881 (quoting Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)). The concept of "fraud" includes the act of embezzlement, which is " 'the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another.' " Grin v. Shine, 187 U.S. 181, 189, 23 S.Ct. 98, 102, 47 L.Ed. 130 (1902).
 
 
 53
 Carpenter, 108 S.Ct. at 321. In Carpenter the petitioner appropriated the information for his own use. Webster defines "appropriate" as "to take exclusive possession ... to set apart for or assign to a particular purpose or use ... to take or make use of without authority or right." Webster's New Collegiate Dictionary 56 (1977 ed.).
 
 
 54
 Carpenter is distinguishable from the facts in this case. We have sought, in vain, to find an actual money or property loss to the pension fund. In this case defendants Coar and Scotto, as trustees of the pension fund, had the power and the authority to invest the fund's monies with others. We fail to see what the defendants "appropriated" in this case. The investment with Omni provided its guaranteed rate of return. Neither that return nor the corpus itself suffered a loss. The alleged kickbacks were paid with Omni's profits, not the pension fund's. See United States v. Evans, 844 F.2d 36 (2d Cir.1988) (deceived party must show it had some money or property loss).
 
 
 55
 As the Supreme Court reiterated in McNally, " '[t]here are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute.' " McNally, 107 S.Ct. at 2881 (quoting Fasulo v. United States, 272 U.S. 620, 629, 47 S.Ct. 200, 202, 71 L.Ed. 443 (1926)); see also Evans, 844 F.2d at 42 (applying rule of lenity in rejecting government's theory that its right to control the transfer or resale of United States military weapons from one foreign country to another is a property right within McNally ). The charge in the indictment that defendants acted against the interest of the fund does not state a violation of the mail and wire fraud statutes as they are currently written. The charge that defendants concealed their activities in order to leave the money with Omni likewise fails to allege a violation of the mail and wire fraud statutes. The charges that defendants violated the investment contract by approving inadequately collateralized and imprudent loans and using holdback accounts to pay overdue interest also fail to allege a violation of the mail and wire fraud statutes. None of these alleged actions caused a loss to the pension fund. Therefore, Count One parts 2(a), (b), 4(1)(a), (b), 4(2)(a), (b), 4(3)(a), (b) will be stricken and Counts Two through Five of the indictment will be dismissed.[13]
 
 
 56
 IV. THE RICO CONSPIRACY AS PREDICATED ON KICKBACKS
 
 A.
 
 57
 Our next inquiry necessarily must be whether the remaining parts of Count One sufficiently allege a RICO conspiracy. With those remaining parts, Count One alleges that appellants conspired "to conduct and to participate directly and indirectly in the conduct of the affairs of Omni through a pattern of racketeering activity," thereby violating RICO, 18 U.S.C.A. Sec. 1962(d).[14] Count One, p 2. The "pattern of racketeering activity" which remains consists of multiple Sec. 1954 violations. Section 1954 makes it illegal for persons involved in the operation of an employee pension benefit plan to receive or solicit kickbacks in exchange for their influence in those operations.[15] Count One alleges that the appellants "would, on multiple occasions solicit, agree to receive, and actually receive certain kickbacks." Count One paragraphs 2(c), 4(1)(c), 4(2)(c).
 
 B.
 
 58
 Appellants raise several arguments in support of their position that Count One is insufficient to allege a RICO conspiracy. First, they argue that the grand jury indictment alleges the Sec. 1954 violations as one racketeering act. They say that without the mail and wire fraud charges, there is only one racketeering act and a single act cannot support a RICO charge. This argument has superficial appeal. The indictment contains only one Sec. 1954 charge for each appellant under the "racketeering acts" section, in paragraph four. However, the charges allege "multiple" solicitations, agreements to receive and receipt of kickbacks by the appellants. Each violation of Sec. 1954 constitutes a separate act of racketeering activity. See 18 U.S.C.A. Sec. 1961(1)(B). Furthermore, the individual appellants need not personally commit each racketeering act; they need only agree to commit it for purposes of a RICO conspiracy. United States v. Adams, 759 F.2d 1099, 1116 (3d Cir.), cert. denied, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985). The remaining portions of Count One of the indictment allege that Coar and Scotto agreed to receive, and did receive on multiple occasions, a share of Omni's profits in exchange for the pension fund investment. Count One p 3(a). They also allege that Zauber "regularly" solicited kickbacks from Friedland and Higgins. These allegations satisfy the Supreme Court's interpretation of the term "pattern" in the RICO statute as requiring at least two, and probably more than two, acts of racketeering activity. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).
 
 C.
 
 59
 Appellants next argue that these allegations do not satisfy Sedima 's "continuity plus relationship" requirement. Id. In Barticheck v. Fidelity Union Bank, 832 F.2d 36 (3d Cir.1987) we held that a single illegal scheme could constitute a "pattern of racketeering activity," so long as the racketeering acts met the "continuity plus relationship" requirement. A combination of specific factors, "such as the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity" could be considered in determining whether a pattern existed. Id. at 39.
 
 
 60
 We applied Barticheck in Environmental Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052 (3d Cir.1988). In that case the defendant, a company which sold aircraft equipment and facilities, obtained a Nigerian Air Force contract by offering a "sales commission" of 20% of the contract price to Nigerian political and military officials. The contract was paid in four installments, after each of which the defendant transferred a portion of the promised commissions to the appropriate recipients. Although the bribe could be considered "a single illegal payment separated into installments," we focused on the factors listed in Barticheck. Environmental Tectonics, 847 F.2d at 1063. The complaint alleged a complex bribery scheme involving predicate acts of mail and wire fraud, bribery, and violations of the Foreign Corrupt Practices Act. Id. The scheme was organized by two American corporations and a European conglomerate. Id. They hired a consultant who developed a complicated process to deter detection of the bribes. Id. The alleged acts harmed other companies bidding for the Nigerian contract, as well as the citizens of Nigeria. Id. Based on these factors, we found that the complaint sufficiently alleged a RICO pattern. Id. at 1064.
 
 
 61
 The scheme in this indictment is admittedly more simple than those involved in Environmental Tectonics and even Barticheck. However, we believe the indictment sufficiently alleges a RICO pattern under the test set out in Barticheck. All three of the appellants solicited kickbacks in exchange for their help in obtaining a $20,000,000 investment for Omni. Appellant Zauber "repeatedly" approached Higgins for kickbacks. Appellants' actions evidenced an attempt to hide the details of the Omni investment from the new trustees. The scheme allegedly began in March of 1982 and continued until appellants were indicted in September of 1985. The Omni investment contract provided for a thirty year investment, indicating that the scheme was open-ended. Although "open-endedness" is not a requirement under Barticheck, it is certainly a factor to be considered in determining whether a pattern meets Sedima 's "continuity" requirement. Barticheck, 832 F.2d at 39. The victims of the scheme included all the members of the pension fund who were relying on the appellants to wisely invest their hard-earned retirement monies. All of the alleged solicitations, agreements to receive and actual receipt of kickbacks were for the purpose of obtaining appellants' influence in exercising their powers over pension plan funds. The acts all involved one particular investment.
 
 
 62
 This indictment is distinguishable from the insufficient complaint in Marshall-Silver Constr. Co. v. Mendel, 835 F.2d 63 (3d Cir.1987). In that case a dispute arose when the plaintiff, a general contractor, withheld payment from a subcontractor, Barton Engineering Co. ("Barton") for poor work quality and late performance. Defendants, who were shareholders and officers at Barton, were unsuccessful in obtaining payment from plaintiff. Defendants filed a petition in Bankruptcy Court requesting that plaintiff be placed in involuntary bankruptcy. The media reported that plaintiff was bankrupt and, as a result, plaintiff lost business and finally folded. Plaintiff alleged in its civil RICO complaint that the defendants knowingly made false allegations in the bankruptcy petition and caused plaintiff's loss of business and ultimate downfall.
 
 
 63
 We found that this complaint failed to allege a pattern of racketeering activity:
 
 
 64
 The target of the RICO statute, as its name suggests, is criminal activity that, because of its organization, duration, and objectives poses, or during its existence posed, a threat of a series of injuries over a significant period of time. Here we have a single victim, a single injury, and a single, short-lived scheme with only two active perpetrators. This is not criminal activity with the kind of continuity of which we spoke in Barticheck.
 
 
 65
 Marshall-Silver, 835 F.2d at 66-67 (footnote omitted).
 
 D.
 
 66
 Finally, appellants argue that the indictment fails to properly charge an "enterprise" and that appellants were not "associated with" Omni, in that they did not "conduct or participate, directly or indirectly, in the conduct of [Omni's] affairs through a pattern of racketeering activity." 18 U.S.C.A. Sec. 1962(c). The indictment identifies Omni as the enterprise. Count One p (1)(e). It alleges that appellants "were associated with Omni in that each ... would and did solicit, agree to receive and in fact received concealed payments from the profits which Omni would and did make through the [investment] agreement with the Pension Fund." Count One p (1)(j).
 
 
 67
 Appellants' central argument on this issue is that they were unaware that Omni was making loans in violation of the investment contract and using the holdback accounts of loans in default to make interest payments to the pension fund. That, however, is irrelevant. Appellants participated indirectly in the conduct of Omni's affairs by providing Omni with $20,000,000 in capital.[16] The racketeering activity was the receipt of kickbacks in exchange for the pension fund investment. Appellants may not have participated in what loans Omni made and to whom, but they made those loans possible by providing Omni with $20,000,000. This supports the allegation that appellants participated indirectly in the conduct of Omni. For RICO conspiracy purposes, "[i]t is well-established that one conspirator need not know the identities of all his co-conspirators, nor be aware of all the details of the conspiracy in order to be found to have agreed to participate in it." United States v. Riccobene, 709 F.2d 214, 225 (3d Cir.), cert. denied, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); see also United States v. Jannotti, 729 F.2d 213, 226 (3d Cir.1984) (government must show person enabled to commit predicate offenses solely by virtue of his involvement in enterprise, or that predicate offenses are related to enterprise's activities), cert. denied, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984); United States v. Forsythe, 560 F.2d 1127, 1136 (3d Cir.1977) (RICO violations dependent upon behavior, not status in enterprise). We find, therefore, that the remaining allegations in Count One of the indictment sufficiently allege an 18 U.S.C.A. Sec. 1962(d) violation.
 
 V. THE REDACTION OF THE INDICTMENT
 
 68
 Appellants next argue that the massive redaction of the third superceding indictment from ninety counts to six violates their Fifth Amendment right to be tried on an indictment returned by a grand jury and their Sixth Amendment right to be informed of the nature of the crime so that they may adequately prepare a defense.
 
 
 69
 This issue is controlled by United States v. Miller, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). In Miller the defendant was charged with three counts of mail fraud in connection with a burglary of his business premises. Before trial, the government moved to strike the count that alleged prior knowledge of the burglary. The defendant was tried and convicted of fraudulently inflating the value of his property loss to his insurer. On appeal, the defendant argued that the fatal variance between the indictment returned by the grand jury and the scheme proved at trial violated his Fifth Amendment grand jury guarantee. The United States Court of Appeals for the Ninth Circuit agreed and vacated his conviction. The Supreme Court reversed. The Court first found that the indictment gave the defendant "clear notice" that he would have to defend against the offenses charged in it. Therefore, he could not be prejudiced by the absence of evidence at trial of his alleged planning in the burglary. The Court also found the indictment sufficient to allow the defendant to plead it as a bar against future double jeopardy problems. Finding that these "notice related concerns" were met, the Court stated:
 
 
 70
 As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime. Indeed, a number of longstanding doctrines of criminal procedure are premised on the notion that each offense whose elements are fully set out in an indictment can independently sustain a conviction.... Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment. A part of the indictment unnecessary to and independent from the allegations of the offense proved may normally be treated as "a useless averment" that "may be ignored."
 
 
 71
 Miller, 471 U.S. at 136, 105 S.Ct. at 1815 (citations omitted). The Court rejected Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887) to the extent that it supports the proposition that an unconstitutional amendment occurs when allegations are dropped from an indictment. Such a change is constitutional, so long as the remaining offense is clearly set out in the original indictment. Miller, 471 U.S. at 144, 105 S.Ct. at 1819. The unconstitutional amendment occurs when impermissible additions are made to the indictment during trial.
 
 
 72
 Such is not the situation here. Although the case was tried on a ninety count indictment and redacted to six counts prior to the jury charge, the remaining counts sufficiently allege RICO conspiracy and Sec. 1954 offenses against the appellants, as we discussed supra. Even as further redacted by our McNally analysis, supra, the indictment alleged, and always alleged, these violations. They are clearly set out in separate counts of the indictment. The charges put appellants on notice that they would have to defend against RICO conspiracy and Sec. 1954 allegations. Although the ninety count third superceding indictment alleged "more crimes or other means of committing the same crime," they evolved into "useless averments" to the essential RICO and Sec. 1954 violations alleged in the indictment.
 
 VI. THE JURY VERDICT
 
 73
 Appellants argue that the jury's general verdict on Count One "does not reveal the number or nature of predicate acts" on which the jury relied in finding appellants guilty of conspiring to violate RICO. Therefore, they argue, the RICO convictions must be reversed under our decision in United States v. Brown, 583 F.2d 659, 669-70 (3d Cir.1978), cert. denied, 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979) and a recent Seventh Circuit decision, United States v. Holzer, 840 F.2d 1343 (7th Cir.1988).
 
 
 74
 If an appellate court is in doubt as to whether a defendant's conviction rests on an impermissible ground, the conviction should be vacated and a new trial ordered. Stromberg v. California, 283 U.S. 359, 367-68, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931). In Brown we reversed defendants' convictions on two counts of mail fraud for insufficient evidence. We therefore reversed defendants' RICO convictions, because we could not determine whether the jury relied on those findings of guilt in its guilty verdict on the RICO count. Similarly, in Holzer the Seventh Circuit vacated the defendant's RICO conviction because it could have been based on mail fraud violations invalid under McNally.
 
 
 75
 This case differs from Brown and Holzer. Here, the jury had to find kickbacks in order to convict appellants under Count One. They were instructed:
 
 
 76
 The indictment charges and the government must prove beyond a reasonable doubt that the defendants Coar, Scotto and Zauber "were associated with Omni in that each said defendant would and did solicit, agree to receive and in fact received concealed payments from the profits which Omni would and did make through the aforesaid agreement with the pension fund." No defendant may be convicted of Count 1 unless you find beyond a reasonable doubt that he was associated with Omni in this way.
 
 
 77
 Jt.App. at 991-92. At defense counsels' insistence, the jury was charged that they must find a kickback scheme to convict defendants of RICO conspiracy, and that the kickback scheme was facilitated by mail and wire fraud. Id. at 990. Regarding the substantive mail fraud charges in Counts Two and Four, the jury was specifically charged that the government must prove beyond a reasonable doubt:
 
 
 78
 1. A mailing for purposes of executing a scheme to defraud the pension fund. These counts specifically incorporate by reference allegations in the indictment as to an agreement by Coar, Scotto and Zauber to receive illegal cash payments and hence you must find that the mailing was in furtherance of a kickback scheme.
 
 
 79
 2. The defendants acted with a specific intent to defraud and engage in the fraud scheme.
 
 
 80
 3. The defendants did knowingly and wilfully [sic] cause the mailing pursuant to their scheme.
 
 
 81
 Id. at 1006-07. The court gave the same instructions on the substantive wire fraud charge of Count Three, instructing the jury that "[t]his count specifically incorporates by reference allegations in Count 1 of the indictment as to an agreement by Coar and Scotto to receive illegal cash payments and hence you must find the wire transfer was in furtherance of a fraud scheme involving illegal cash payments." Id. at 1007-08.
 
 
 82
 With respect to Count One, the jury was also instructed that each act in violation of Sec. 1954 constituted an act of racketeering, and that each co-conspirator must merely agree to the commission, not personally commit, two or more of these acts. Id. at 1001-02.[17] Therefore, the jury had to find at least three violations of Sec. 1954 by convicting each defendant of RICO conspiracy.[18] See United States v. Weisman, 624 F.2d 1118, 1124-25 (2d Cir.) ("unlike the present case in which the conspiracy counts covered the substantive offenses charged in the [RICO] predicate acts, in Brown the substantive offenses charged as predicate acts were distinct and hence it was arguably impossible to determine from the verdict which offenses the jury relied upon in finding a pattern of racketeering."), cert. denied, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980). Under our RICO analysis, supra Section IV(B), this is enough to establish a Sec. 1962(d) violation.
 
 
 83
 Evidence introduced at trial supports our analysis. There was evidence that Coar and Scotto solicited kickbacks from Friedland, and that kickbacks were discussed at the second lunch meeting at "Paul and Jimmy's."[19] Zauber directly solicited kickbacks from Higgins on at least six separate occasions, beginning in late 1982 and continuing until April of 1984. Higgins gave money to Friedland to pay off Coar, Scotto and Zauber. The Omni investment was set up for a period of thirty years. Based on Zauber's continuing requests for money, it is apparent that the solicitations would have continued except for the new trustees' discovery of the Omni loan defaults and subsequent termination of the pension fund investment.
 
 
 84
 Other circumstantial evidence supports the inference that all of the appellants were involved in a kickback scheme. Several pension fund officers testified that the appellants actively sought to conceal the illicit Omni investment scheme. Alfred Piperata, pension fund manager, specifically recalled that Scotto called him on approximately July 12, 1983 in regard to the Omni investment proposal letter which Piperata had placed, as was his custom, in a file with other such letters. Supplementary Appendix ("Supp.App.") at 29-30. Scotto scolded Piperata for not having brought the letter to the trustees' attention and directed him to invite Higgins to the next board meeting to make a formal presentation. Id. at 30, 32. When Piperata's own investigation into Higgins revealed a poor business reputation, including IRS and bankruptcy problems, Scotto told him that he was overly concerned and that "[i]f there's anything wrong we'll take care of it." Id. at 70. Coar told Piperata "he had heard all the innuendos he intended to hear and was not going to call anybody" to check into Piperata's allegations. Id. at 59. Zauber reacted angrily to Piperata's report that Higgins was a long-time friend of David Friedland, accusing Piperata of having a "state police mentality." Id. at 57. When the new trustees joined the board in January of 1983, they were told by Scotto and Zauber that "anything that happened prior to January 1, 1983 was not their problem." Id. at 96.
 
 
 85
 Rocco Morongello testified that Scotto told him and the other new trustees that they were not responsible for investments made prior to January of 1983. Id. at 115. He also testified that Zauber gave Piperata a memorandum indicating that only the trustees who entered into the Omni investment were responsible for it as fiduciaries. Id. at 116.
 
 
 86
 When the new trustees found out that they were liable as fiduciaries, they travelled to Florida in January of 1984 to learn more about Omni and found that loans made by Omni had exceeded the 10% corpus limit. Higgins testified that during their visit he drafted a letter, predated December 9, 1982, which Zauber signed in Higgins's Florida office, authorizing such loans. Id. at 170-73, 179. Testimony showed that Coar and Scotto told the new trustees that they had authorized the letter in 1982 and that Scotto had a copy of it in his files. Id. at 110-11, 128. When the new trustees were advised to terminate the Omni investment, Scotto was reluctant to vote to terminate and expressed concern that the fund might be exposed to a lawsuit. Id. at 104-05.
 
 
 87
 A jury is presumed to have acted rationally. We must assume that the jury followed the court's instructions and arrived at a verdict based on those instructions. Unlike Brown and Holzer, where it was impossible to determine whether the jury had relied on invalid predicate acts, the jury in this case had to find kickbacks. See United States v. Brennan, 685 F.Supp. 883, 885 (E.D.N.Y.1988) ("No rational jury could have found the defendant guilty under RICO based on the invalid wire fraud offenses without also basing its conviction on the valid Travel Act offenses."). Because the jury necessarily did not rely on the invalid mail and wire fraud violations, we will not vacate appellant's RICO convictions on this ground.[20]
 
 VII. CONCLUSION
 
 88
 We will therefore reverse and vacate appellants' convictions for mail and wire fraud under Counts Two through Five of the redacted indictment. We will affirm appellants' convictions under Count One and Zauber's conviction under Count Six of the redacted indictment. Finally, because we are vacating the mail and wire fraud convictions, we will remand to the district court for resentencing. United States v. Townsley, 843 F.2d 1070, 1086 (8th Cir.1988); Holzer, 840 F.2d at 1352.
 
 APPENDIX
 INDICTMENT
 
 89
 The Grand Jury in and for the District of New Jersey, sitting at Newark, charges that:COUNT ONE
 
 
 90
 1. At times material to the allegations contained in this Indictment:
 
 
 91
 a. Local 701 of the International Brotherhood of Teamsters (hereinafter referred to as "Local 701"), with offices in North Brunswick, New Jersey, and was an "employee organization" within the meaning of Section 1954 of Title 18 of the United States Code and the provisions of Title I of the Employee Retirement Income Security Act of 1974 (hereinafter referred to as "ERISA", 29 U.S.C. Section 1002 and 1003[a] whose activities affected interstate commerce.
 
 
 92
 b. Local 701 maintained for its members an "employee pension benefit plan" (within the meaning of 29 U.S.C. Section 1002 and 18 U.S.C. Section 1954), which was known as the "Mid-Jersey Trucking Industry, Local 701 Pension Fund" (hereinafter referred to as the "Pension Fund").
 
 
 93
 c. Between approximately January 1, 1975 and January 1, 1983, the Defendant ROBERT COAR (the president of Local 701 until 1981) and the Defendant FRANK SCOTTO (a consultant to various trucking industry organizations) served as the sole trustees (within the meaning of Section 1954(1) of Title 18 of the United States Code) of the Pension Fund. Thereafter, Martin McDermott, Anthony Sidoti, Enrico Moscatello, Rocco Morongello, and Leon Smith served with the Defendants ROBERT COAR and FRANK SCOTTO for varying periods of time as "new trustees".
 
 
 94
 d. The Defendant KENNETH P. ZAUBER was an attorney-at-law in the State of New Jersey and was retained in the position of "counsel" (within the meaning of Section 1954 of Title 18 of the United States Code) to and "chief executive officer" of the Pension Fund.
 
 
 95
 e. Omni Funding Group, Inc. (hereinafter referred to as "Omni"), with offices in Ft. Lauderdale, was a Florida based corporation, engaged in the business of making mortgage loans both within and without the State of Florida. As such, it constituted an enterprise, within the meaning of Section 1961(4) of Title 18 of the United States Code, which was engaged in and the activities of which affected interstate and foreign commerce.
 
 
 96
 f. The Defendant DAVID FRIEDLAND, a native of New Jersey and sometimes resident of Florida, was associated with and employed by Omni in the capacity of a hidden partner, manager, advisor, consultant, and operator, and thereby was an officer, counsel, agent and employee thereof, within the meaning of Title 18 United States Code, Section 1954. Prior to approximately January of 1977, he was retained as "counsel" to the Pension Fund, and thereafter, until approximately June of 1979, he served as counsel to Local 701[.] Commencing on May 24, 1982, and thereafter up to the date of the filing of this Indictment, the defendant DAVID FRIEDLAND was prohibited under the provisions of ERISA (29 U.S.C. Section 1111) from serving as a fiduciary, agent, custodian, counsel, or consultant to any employee benefit plan, including particularly the Pension Fund herein.
 
 
 97
 g. Joseph J. Higgins, formerly a resident of New Jersey and later a resident of Florida, was associated with Omni as the owner of record and chief operating officer and thereby was an officer, counsel, agent and employee of an organization which provided benefit plan services to the Pension Fund within the meaning of Title 18 of the United States Code, Section 1954.
 
 
 98
 h. Omni and the Pension Fund entered into an agreement which had, among others, the following terms and conditions: (1) The Pension Fund would place twenty million dollars ($20,000,000) of its assets under the control of Omni for further investment in commercial and residential mortgage loans. (2) Omni represented that it had not employed and would not knowingly employ anyone who was barred under ERISA from holding a fiduciary position or anyone whose prior willful conduct had ever damaged the Pension Fund. (3) Omni agreed that no Pension Fund assets would be invested in any loan involving a bar, restaurant or tavern. (4) Omni promised not to use Pension Fund assets to make any commercial loan which exceeded ten percent (10%) of the corpus (i.e. an amount in excess of $2,000,000), unless it had prior approval from the Pension Fund. (5) Omni agreed that it would advise the Pension fund of any default with respect to any mortgage payment within thirty (30) days of the time when the payment became overdue. (6) Omni agreed that all loans would be secured by first or second mortgages and protected as to principal and interest either through mortgage insurance or by means of a bank letter of credit--except that on commercial loans the protection need only cover fifteen percent (15%) of the appraised value of the mortgaged property. (7) Omni agreed to pay the Pension Fund interest on its investments at a rate of one percent (1%) above the six month treasury bill rate on each residential mortgage loan and two percent (2%) above the six month treasury bill rate for each commercial loan; and Omni was then entitled to keep as its compensation the difference between the amount paid and the amount produced by the actual interest rate charged to the borrower. (8) According to said agreement Omni was entitled to receive "origination fees" and "participations" in connection with such loans. (9) Omni agreed that any substantial material misrepresentation on its part, during the life of the agreement, rendered said agreement voidable by the Pension Plan.
 
 
 99
 i. By virtue of the aforesaid agreement, Omni became an organization which provided benefit plan services to the Pension Fund, within the meaning of Section 1954(4) of Title 18 of the United States Code; and, as a result of the aforesaid agreement, the Defendant DAVID FRIEDLAND as well as Joseph J. Higgins became fiduciaries with respect to the Pension Fund, under the provisions of ERISA (29 U.S.C. Section 1002.
 
 
 100
 j. The defendants ROBERT COAR, FRANK SCOTTO and KENNETH P. ZAUBER were associated with Omni in that each said defendant would and did solicit, agree to receive, and in fact received concealed payments from the profits which Omni would and did make through the aforesaid agreement with the Pension Fund.
 
 
 101
 2. Continuously between approximately March of 1982 and the date of the filing of this indictment, in the District of New Jersey and elsewhere, the Defendants
 
 
 102
 DAVID FRIEDLAND,
 
 
 103
 ROBERT COAR,
 
 FRANK SCOTTO and
 KENNETH P. ZAUBER
 
 104
 unlawfully did knowingly and willfully combine, conspire, confederate, and agree together and with others, who are both known and unknown to the Grand Jury, to conduct and to participate directly and indirectly in the conduct of the affairs of Omni through a pattern of racketeering activity in violation of Section 1962(c) of Title 18 of the United States Code, as follows:
 
 
 105
 a. The Defendants DAVID FRIEDLAND, ROBERT COAR, FRANK SCOTTO and KENNETH P. ZAUBER and their co-conspirators would and did devise various schemes and artifices to defraud the Pension Fund and its Beneficiaries of money and property and of the right to honest, faithful, prudent and diligent services by its employees--all relating to the Pension Fund's dealings with Omni, and to the manner in which Omni would invest and otherwise handle said $20,000,000 in Pension Fund assets, as described hereinafter--and in furtherance of each said scheme and artifice the said Defendants and their co-conspirators would, on numerous occasions during the period aforesaid, place in certain post offices and authorized depositories for mail matter and willfully cause to be sent and delivered by the Postal Service certain matters and things--being more specifically contracts, reports, checks, business correspondence, and other documents relating to the investment of the Pension Fund assets by Omni--all for purposes of executing and attempting to execute the aforesaid schemes and artifices and all in violation of Sections 1341 and 2 of Title 18 of the United States Code;
 
 
 106
 b. The Defendants DAVID FRIEDLAND, ROBERT COAR, FRANK SCOTTO and KENNETH P. ZAUBER and their co-conspirators would and did devise various schemes and artifices to defraud the Pension Fund and its Beneficiaries of money and property and of the right to honest, faithful, prudent and diligent services by its employees--all relating to the Pension Fund's dealings with Omni, and to the manner in which Omni would invest and otherwise handle said $20,000,000 in Pension Fund assets, as described hereinafter--and in furtherance of each said scheme and artifice the said Defendants and their co-conspirators would, on numerous occasions during the period aforesaid, transmit and willfully cause to be transmitted by means of wire and radio communication in interstate commerce certain signs, signals, and sounds--all for purposes of executing the aforesaid schemes and artifices and all in violation of Sections 1343 and 2 of Title 18 of the United States Code; and
 
 
 107
 c. The Defendants DAVID FRIEDLAND, ROBERT COAR, FRANK SCOTTO, and KENNETH P. ZAUBER, along with their co-conspirators, by virtue of their respective positions in regard to the Pension Fund would, on multiple occasions solicit, agree to receive, and actually receive certain kickbacks, gifts, loans, money, and things of value because of their actions, decisions, and other duties relating to questions and matters concerning the Pension Fund, as described hereinafter--all in violation of Sections 1954 and 2 of Title 18 of the United States Code.
 
 
 108
 d. The Defendants DAVID FRIEDLAND, and his co-conspirator Joseph J. Higgins would, on multiple occasions give, offer, promise to give and promise to offer certain fees, kickbacks, commissions, gifts, loans, money, and things of value to Defendants ROBERT COAR, FRANK SCOTTO, and KENNETH P. ZAUBER, because of said Robert Coar's, Frank Scotto's, and Kenneth P. Zauber's actions, decisions, and duties regarding the assets of the Pension Fund and its dealings with Omni, as described hereinafter--all in violation of Sections 1954 and 2 of Title 18 of the United States Code.
 
 3. Manner and Means
 
 109
 It was part of the conspiracy that the Defendants would and did utilize a variety of strategems to enrich themselves unjustly and fraudulently with respect to the $20,000,000 of Pension Fund assets entrusted to Omni, including:
 
 
 110
 a. ROBERT COAR and FRANK SCOTTO "Kickbacks": It was part of said conspiracy that between approximately April of 1982 and November of 1982, the Defendant DAVID FRIEDLAND and co-conspirator Joseph J. Higgins would and did offer to give Defendants ROBERT COAR and FRANK SCOTTO a portion of the profits which Omni would make from investing the aforesaid $20,000,000 of Pension Fund assets, and Defendants ROBERT COAR and FRANK SCOTTO would and did agree to accept said share of Omni's profits, in return for causing the Pension Fund to enter into the aforesaid agreement with Omni and otherwise assisting Omni in its dealings with the Pension Fund. Defendants ROBERT COAR and FRANK SCOTTO thereafter would and did share in said profits--receiving said shares on multiple occasions through various stratagems designed to conceal the aforesaid facts from other Pension Fund employees and, subsequent to January 1, 1983, from the "new trustees."
 
 
 111
 b. KENNETH P. ZAUBER "Kickbacks": It was further part of said conspiracy that, commencing during approximately May of 1982, and regularly thereafter, Defendant KENNETH P. ZAUBER would and did solicit, request and demand from Defendant DAVID FRIEDLAND and co-conspirator Joseph J. Higgins that, in return for assisting Omni in its dealings with the Pension Fund, he [would] also share in Omni profits from investment of the aforesaid $20,000,000 of Pension Fund assets. Pursuant to said requests, demands and solicitations, KENNETH P. ZAUBER would and did, on multiple occasions, receive money and other things of value from Defendant DAVID FRIEDLAND and co-conspirator Joseph J. Higgins--all of which would be and was concealed from other Pension Fund employees and, subsequent to January 1, 1983, from the "new trustees."
 
 
 112
 c. David Friedland's Hidden Role in Omni: It was further part of the said conspiracy that commencing during approximately April of 1982, the Defendants DAVID FRIEDLAND, ROBERT COAR, FRANK SCOTTO, and KENNETH P. ZAUBER, and co-conspirator Joseph J. Higgins would and did conceal from the Pension Fund, employees of the Pension Fund, and, later from the "new trustees" that Defendant DAVID FRIEDLAND was associated with Omni, was exercising control over the investment and disposition of the $20,000,000 in Pension Fund assets entrusted to Omni, and was sharing in over $3,000,000 in profits received by Omni through the investment and disposition of said assets--notwithstanding the fact that he was prohibited from doing so by the provisions of ERISA (29 U.S.C. Section 1111). In furtherance thereof, during October of 1982 said Defendants would and did cause a "letter-memorandum of understanding" between Omni and the Pension Fund to be executed which falsely represented that Omni had not and would not knowingly employ anyone who was barred by ERISA from holding a fiduciary position, or anyone whose willful conduct had ever harmed the Pension Fund. Thereafter, and up until the date of the filing of this indictment said Defendants would and did continue by diverse means to conceal Defendant DAVID FRIEDLAND's hidden interest and involvement in Omni.
 
 
 113
 d. The "Back-dated Letter": It was further part of the conspiracy that Defendants DAVID FRIEDLAND, ROBERT COAR, FRANK SCOTTO and KENNETH P. ZAUBER and their co-conspirator Joseph J. Higgins would and did cause Omni to issue loans of Pension Fund assets in excess of the ten percent (10%) lending limit without prior approval from the Pension Fund. In order to conceal said misconduct from the "new trustees", during approximately January of 1984, the Defendants DAVID FRIEDLAND and KENNETH P. ZAUBER and their co-conspirator Joseph J. Higgins would and did fabricate a letter, on Pension Fund letterhead, which would be and was back-dated to "December 9, 1982." This letter would and did purport to authorize Omni to make loans of Pension Fund assets up to a limit of five million dollars ($5,000,000) without prior approval from the Pension Fund. In an effort to deceive the "new trustees" with respect to the past loans which exceeded the ten percent (10%) lending limit Joseph J. Higgins would and did display this letter as his authority for having made the said loans during a meeting with the "new trustees" in January of 1984.
 
 
 114
 e. Holdback Accounts and Delinquent Loans: It was further part of said conspiracy that Defendant DAVID FRIEDLAND and co-conspirator Joseph J. Higgins aided and abetted by Defendants ROBERT COAR, FRANK SCOTTO, and KENNETH P. ZAUBER would and did conceal that mortgage payments on various loans of Pension Fund assets were delinquent and that said loans were in default as follows: Beginning in approximately December of 1982 and continuing thereafter until approximately October of 1984, the Defendants ROBERT COAR, FRANK SCOTTO, and KENNETH P. ZAUBER would and did purport to authorize Omni to permit borrowers to post a cash deposit in lieu of obtaining mortgage insurance or a bank letter of credit as specifically required under the terms of the agreement with the Pension Fund. As a result, Omni would regularly withhold fifteen (15%) of the face amount of each loan issued from the Pension Fund assets, and it would place this amount (hereinafter referred to as the "hold-back") in a separate account under Omni's control. Thereafter, whenever payments on such a loan would fall into arrears, Omni would not notify the Pension Fund of the delinquency with respect to the payments and of the potential for a default, as required by the contract, but instead Defendant DAVID FRIEDLAND and co-conspirator Joseph J. Higgins, aided and abetted by Defendants ROBERT COAR, FRANK SCOTTO, and KENNETH P. ZAUBER, would and did cause mortgage payments to be made on the said loan from the aforesaid holdback money, thereby concealing said delinquencies and creating the false and misleading impression with the Pension Fund that such loans were not in jeopardy. This would cause the "new trustees" not to inquire into their status and propriety of Omni's loans and Omni's handling of the Pension Fund assets and would enable the said Defendants to continue to reap profits by controlling the Pension Fund's $20,000,000. During the aforesaid period of time hold-back accounts on loans issued from Pension Fund assets were depleted through the aforesaid scheme in the amounts reflected below:
 
 
 115
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TABLE
 
 116
 f. It was further part of said conspiracy that Defendant DAVID FRIEDLAND and Co-Conspirator Joseph J. Higgins aided and abetted by Defendants ROBERT COAR, FRANK SCOTTO and KENNETH P. ZAUBER would and did cause Omni to make loans of Pension Fund assets which were: (a) for purposes prohibited by the express terms of the agreement between Omni and the Pension Fund; (b) secured by inadequate collateral, in violation of the terms of said agreement; and (c) otherwise improper and imprudent.
 
 
 117
 g. It was further part of the conspiracy that between approximately January 1, 1983 and October 1984 Defendants ROBERT COAR, FRANK SCOTTO, and KENNETH P. ZAUBER would endeavor to thwart discovery by the "new trustees" of the aforesaid schemes, and prevent said "new trustees" from taking appropriate remedial action, through repeated acts of malfeasance and non feasance which would include: (1) Falsely advising said "new trustees" that they had no responsibilities or duties with respect to Omni's loans of Pension Fund assets; (2) Falsely advising said "new trustees" that the so-called "hold back" accounts would adequately protect the Pension Fund's interests in the event that mortgages made by Omni went into default; (3) Endeavoring to deter the said "new trustees" from initiating an independent investigation of Omni's activities by outside auditors and attorneys; (4) Endeavoring to convince the "new trustees" to keep the Omni/Pension Fund agreement in force after the "new trustees" had concluded that the Pension Fund's relationship with Omni was detrimental to the best interests of the Pension Fund's beneficiaries; (5) Otherwise withholding and concealing their knowledge of the aforesaid schemes from the "new trustees."
 
 Racketeering Acts
 
 118
 4. It was further part of said conspiracy that the defendants would each play various roles and would agree to commit the following acts in a pattern of racketeering activity:
 
 
 119
 (1) ROBERT COAR and FRANK SCOTTO Kickbacks
 
 
 120
 (a) Between approximately April of 1982 and October of 1984, The Defendants DAVID FRIEDLAND, ROBERT COAR, and FRANK SCOTTO, and co-conspirator Joseph J. Higgins would and did devise a scheme and artifice to defraud the Pension Fund and the beneficiaries thereof, of the right to honest, faithful prudent and diligent services by the Pension Fund's employees in that Defendant DAVID FRIEDLAND and co-conspirator Joseph J. Higgins would and did agree to give, and Defendants ROBERT COAR and FRANK SCOTTO would and did agree to receive, a concealed share of the profits which Omni would make from investing the aforesaid $20,000,000 of Pension Fund assets, in return for Defendants ROBERT COAR and FRANK SCOTTO causing the Pension Fund to enter into the aforesaid agreement with Omni and otherwise assisting Omni in its dealings with the Pension Fund--all as further described in paragraph 3(a) above. The said Defendants, for the purpose of executing the aforesaid scheme and artifice to defraud would and did, on multiple occasions, unlawfully, knowingly and willfully cause to be placed in certain post offices and authorized depositories for mail matter and to be delivered by the United States Postal Service according to the directions thereon certain matters and things--being more specifically contracts, business correspondence and other documents relating to Omni's dealings with the Pension Fund--all of which would be and was in violation of Sections 1341 and 2 of Title 18 of the United States Code;
 
 
 121
 (b) Between approximately April of 1982 and October of 1984, for the purpose of executing the aforesaid scheme and artifice to defraud, described in Paragraphs 3a and 4(1)(a) above, the Defendants DAVID FRIEDLAND, ROBERT COAR, and FRANK SCOTTO, and co-conspirator Joseph J. Higgins would and did, on multiple occasions, unlawfully transmit and willfully cause to be transmitted by means of wire and radio communications in interstate commerce certain signs, signals and sounds--all of which would be and was in violation of Sections 1343 and 2 of Title 18 of the United States Code;
 
 
 122
 (c) Between approximately April of 1982 and October of 1984, the Defendants ROBERT COAR and FRANK SCOTTO would and did, on multiple occasions, solicit, agree to receive and actually receive certain fees, kickbacks, commissions, gifts, money and things of value, as described in Paragraph 3a above, because of their actions, duties, and decisions regarding the assets of the Pension Fund and matters pertaining to the Pension Fund's dealings with Omni--all of which would be and was in violation of Sections 1954 and 2 of Title 18 of the United States Code;
 
 
 123
 (2) KENNETH P. ZAUBER Kickbacks
 
 
 124
 (a) Between approximately May of 1982 and October of 1984, the Defendants DAVID FRIEDLAND and KENNETH P. ZAUBER, and co-conspirator Joseph J. Higgins would and did devise a scheme and artifice to defraud the Pension Fund, and the beneficiaries thereof, of the right to honest, faithful prudent and diligent services by the Pension Fund's employees in that Defendant DAVID FRIEDLAND and co-conspirator Joseph J. Higgins would and did agree to give, and Defendant KENNETH P. ZAUBER would and did agree to receive, a concealed share of the profits which Omni would make from investing the aforesaid $20,000,000 of Pension Fund assets, in return for Defendant KENNETH P. ZAUBER's assistance to Omni in its dealings with the Pension Fund--all as further described in paragraph 3(b) above. The said Defendants, for the purpose of executing the aforesaid scheme and artifice to defraud would and did, on multiple occasions, unlawfully, knowingly and willfully cause to be placed in certain post offices and authorized depositories for mail matter and to be delivered by the United States Postal Service according to the directions thereon certain matters and things--being more specifically contracts, business correspondence and other documents relating to Omni's dealings with the Pension Fund--all of which would be and was in violation of Sections 1341 and 2 of Title 18 of the United States Code;
 
 
 125
 (b) Between approximately May of 1982 and October of 1984, for the purpose of executing the aforesaid scheme and artifice to defraud, described in Paragraphs 3b and 4(2)(a) above, the Defendants DAVID FRIEDLAND and KENNETH P. ZAUBER, and co-conspirator Joseph J. Higgins would and did, on multiple occasions, unlawfully transmit and willfully cause to be transmitted by means of wire and radio communications in interstate commerce certain signs, signals and sounds--all of which would be and was in violation of Sections 1343 and 2 of Title 18 of the United States Code;
 
 
 126
 (c) Between approximately May of 1982 and October of 1984, the Defendant KENNETH P. ZAUBER would and did, on multiple occasions, solicit, agree to receive and actually receive certain fees, kickbacks, commissions, gifts, money and things of value, as described in Paragraph 3b above, because of and his actions, duties, and decisions regarding the assets of the Pension Fund and matters pertaining to the Pension Fund and its dealings with Omni--all of which would be and was in violation of Sections 1954 and 2 of Title 18 of the United States Code;
 
 
 127
 (3) "Hold-Back" accounts and Delinquent Loans
 
 
 128
 (a) Between approximately December of 1982 and October of 1984, the Defendants DAVID FRIEDLAND, ROBERT COAR, FRANK SCOTTO and KENNETH P. ZAUBER and co-conspirator Joseph J. Higgins would and did devise a scheme and artifice to defraud the Pension Fund and the beneficiaries thereof of the right to honest, faithful, prudent and diligent services by the Pension Fund's employees in that Defendant DAVID FRIEDLAND and co-conspirator Joseph J. Higgins, aided and abetted by Defendants ROBERT COAR, FRANK SCOTTO and KENNETH P. ZAUBER, would and did conceal delinquencies and defaults on various loans of Pension Fund assets made by Omni by failing to notify the Pension Fund of said delinquencies and defaults and by causing mortgage payments on said loans to be made from "hold-back" accounts--thereby creating the false and misleading impression with the Pension Fund that said loans were not in jeopardy and enabling the said Defendants to continue to reap profits by controlling the Pension Fund's $20,000,000--all as further described in Paragraph 3e above. Said Defendants, for the purpose of executing the aforesaid scheme and artifice to defraud would and did, on multiple occasions, unlawfully, knowingly and willfully cause to be placed in certain post offices and authorized depositories for mail matter and to be delivered by the United States Postal Service according to the directions thereon certain matters and things--being more specifically contracts, reports, mortgage documents, business correspondence and other documents relating to said loans--all of which would be and was in violation of Sections 1341 and 2 of Title 18 of the United States Code.
 
 
 129
 (b) Between approximately January of 1983 and October of 1984, for the purpose of executing the aforesaid scheme and artifice to defraud, described in Paragraphs 3e and 4(4)(a) above, the Defendants DAVID FRIEDLAND, ROBERT COAR, FRANK SCOTTO, and KENNETH P. ZAUBER and co-conspirator Joseph J. Higgins would and did, on multiple occasions, unlawfully transmit and willfully cause to be transmitted by means of wire and radio communications in interstate commerce certain signs, signals and sounds--all of which would be and was in violation of Sections 1343 and 2 of Title 18 of the United States Code.
 
 
 130
 All of which was in violation of Section 1962(d) of Title 18 of the United States Code.COUNT TWO
 
 
 131
 1. Paragraphs 1, 3(a), and 4(1)(a) of Count One are hereby realleged and incorporated as though set forth fully herein.
 
 
 132
 2. On or about June 22, 1982, in the District of New Jersey and elsewhere, the Defendants herein,
 
 
 133
 DAVID FRIEDLAND,
 
 ROBERT COAR, and
 
 134
 FRANK SCOTTO,
 
 
 135
 for the purpose of executing the aforesaid scheme and artifice to defraud the Pension Fund, unlawfully did knowingly and willfully cause to be placed in a certain post office and authorized depository for mail matter and to be delivered by the United States Postal Service according to the directions thereon, the following matter and thing--being a letter from Omni to the Pension Fund soliciting the Pension Fund's interest in Omni's investment proposal, which was mailed from Omni in Ft. Lauderdale, Florida to the Pension Fund's offices in North Brunswick, New Jersey.
 
 
 136
 All of which was in violation of Sections 1341 and 2 of Title 18 of the United States Code.
 
 COUNT THREE
 
 137
 1. Paragraphs 1, 3(a), 4(1)(a) and 4(1)(b) of Count One are hereby realleged and incorporated as though set forth fully herein.
 
 
 138
 2. On or about October 14, 1982, in the District of New Jersey and elsewhere, the Defendants herein,
 
 
 139
 DAVID FRIEDLAND,
 
 ROBERT COAR, and
 
 140
 FRANK SCOTTO,
 
 
 141
 for the purpose of executing the aforesaid scheme and artifice to defraud the Pension Fund, unlawfully did knowingly and willfully transmit and cause to be transmitted by means of wire and radio communication in interstate commerce, between the offices of the New Jersey National Bank in New Jersey and the Southeast Bank N.A. in Miami, Florida, certain signals and sounds--being the wire transfer of $15,000,000 of the Pension Fund's assets from said New Jersey National Bank to said Southeast Bank, N.A.
 
 
 142
 All of which was in violation of Sections 1343 and 2 of Title 18 of the United States Code.
 
 COUNT FOUR
 
 143
 1. Paragraphs 1, 3(a), and 4(1)(a) of Count One are hereby realleged and incorporated as though set forth fully herein.
 
 
 144
 2. On or about December 9, 1982, in the District of New Jersey and elsewhere, the Defendants herein,
 
 
 145
 DAVID FRIEDLAND,
 
 ROBERT COAR, and
 
 146
 FRANK SCOTTO,
 
 
 147
 for the purpose of executing the aforesaid scheme and artifice to defraud the Pension Fund, unlawfully did knowingly and willfully cause to be placed in a certain post office and authorized depository for mail matter and to be delivered by the United States Postal Service according to the directions thereon, the following matter and thing--being a letter to the Magten Asset Management Corp directing said corporation to transfer $5,000,000 of the Pension Fund's assets to the Southeast Bank N.A., which letter was mailed from the Pension Fund's offices in North Brunswick, New Jersey to the Magten Asset Management Corp. in New York City, New York.
 
 
 148
 All of which was in violation of Sections 1341 and 2 of Title 18 of the United States Code.
 
 COUNT FIVE
 
 149
 1. Paragraphs 1, 3(b), and 4(2)(a) of Count One are hereby realleged and incorporated as though set forth fully herein.
 
 
 150
 2. On or about December 6, 1982, in the District of New Jersey and elsewhere, the Defendants herein,
 
 DAVID FRIEDLAND and
 KENNETH P. ZAUBER
 
 151
 for the purpose of executing the aforesaid scheme and artifice to defraud the Pension Fund, unlawfully did knowingly and willfully cause to be placed in a certain post office and authorized depository for mail matter and to be delivered by the United States Postal Service according to the directions thereon, the following matter and thing--being a letter from KENNETH P. ZAUBER to Omni authorizing Omni to utilize so-called holdback accounts in lieu of mortgage insurance or letters of credit, which was mailed from the Pension Fund's offices in North Brunswick, New Jersey to Omni in Ft. Lauderdale, Florida.
 
 
 152
 All of which was in violation of Sections 1341 and 2 of Title 18 of the United States Code.
 
 COUNT SIX
 
 153
 1. Paragraphs 1, 3(b), and 4(2)(c) of Count One of this indictment are realleged and incorporated as though fully set forth herein.
 
 
 154
 2. Between approximately January 1, 1983 and April of 1984 in the District of New Jersey and elsewhere, the Defendant herein,
 
 
 155
 KENNETH P. ZAUBER,
 
 
 156
 unlawfully did solicit, and agree to receive from Omni certain kickbacks, commissions, loans, gifts and other things of value, consisting of sums of money from Omni because of his actions, duties and decisions regarding the assets of the Pension Fund and matters pertaining to the Pension Fund and its dealings with Omni.
 
 
 157
 All of which was in violation of Section 1954 of Title 18 of the United States Code.
 
 
 
 [1]
 David Friedland, also named in the indictment, remained a fugitive until his arrest in the Maldive Islands in December, 1987
 
 
 [2]
 Zauber and Friedland were childhood friends. Jt.App. at 2028
 
 
 [3]
 Higgins was dropped from the original indictment after he agreed to cooperate with the government and pled guilty to several counts
 
 
 [4]
 Omni was formed by Higgins in 1981. Its total gross receipts in that year were only $1,250. Higgins, also an attorney, had known Friedland since 1966, when they were both members of the New Jersey legislature
 
 
 [5]
 Higgins testified that Zauber approached him for money "for expenses" in late 1982 and January 1983, at Zauber's wedding on Valentine's Day, 1983, at a Zauber family gathering in 1983, at a jewelry store in Florida on June 8, 1983 and at the Sheraton Hotel at Newark Airport in April 1984. Jt.App. at 1464-1511. Each time, Higgins told Zauber to contact Friedland for the money
 
 
 [6]
 At trial the government introduced evidence that Zauber and his wife were in the process of building a home between August 1983 and late 1984/early 1985 and that they made several large cash payments directly to the architect and general contractor, totalling $115,000. Zauber introduced evidence that his architect advised him to pay in cash to get a better price on the construction and that the money came from bank loans and the sale of other properties
 
 
 [7]
 The new trustees joined the board pursuant to a settlement agreement in a civil lawsuit between the union and trustees Coar and Scotto. The union lawsuit attacked the lifetime tenure of Coar and Scotto and sought an increase in the number of trustees from two to six
 
 
 [8]
 The wire fraud statute provides, in its entirety:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 18 U.S.C.A. Sec. 1343.
 
 
 [9]
 The redacted indictment was actually the third superceding indictment returned by the grand jury against Friedland, Zauber, Coar and Scotto and was redacted by the district court from ninety counts to six
 
 
 [10]
 Count Six does not allege mail or wire fraud and is therefore not implicated in this discussion
 
 
 [11]
 The Piccolo instruction required the jury to find "that the defendant devised a scheme or artifice to defraud United Engineers of its right to the honest, faithful and loyal services of its employee, ... and further, to defraud both United Engineers and Delmarva Power and Light Company of money." Piccolo, 835 F.2d at 520 (emphasis in original)
 
 
 [12]
 The government bases this assertion on a large scale drop in the treasury bill rate after the initial pension fund investment of $20,000,000 with Omni. According to the government, at one point Magten was paying a 17% return while Omni was only paying an overall 9% return
 
 
 [13]
 Because we are dismissing Count Five, we find it unnecessary to address Zauber's argument that the evidence was insufficient to show that he had joined the kickback scheme by December 6, 1982, when the holdback letter was mailed
 
 
 [14]
 Section 1962(d) makes it a crime, inter alia, to conspire to violate Sec. 1962(c) which provides, in pertinent part:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....
 18 U.S.C.A. Sec. 1962(c).
 
 
 [15]
 Section 1954 provides, in pertinent part:
 Whoever being--
 (1) an administrator, officer, trustee, custodian, counsel, agent, or employee of any employee welfare benefit plan or employee pension benefit plan; or
 (2) an officer, counsel, agent, or employee of an employer or an employer any of whose employees are covered by such plan; or
 (3) an officer, counsel, agent, or employee of an employee organization any of whose members are covered by such plan; or
 (4) a person who, or an officer, counsel, agent, or employee of an organization which, provides benefit plan services to such plan
 receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of his actions, decisions, or other duties relating to any question or matter concerning such plan or any person who directly or indirectly gives or offers, or promises to give or offer, any fee, kickback, commission, gift, loan, money, or thing of value prohibited by this section, shall be fined not more than $10,000 or imprisoned not more than three years, or both....
 18 U.S.C.A. Sec. 1954.
 
 
 [16]
 The pension fund was the only source of Omni capital. Apparently no other company invested in Omni, nor did Omni seek investments from any source other than the pension fund
 
 
 [17]
 During the district court's charge on the RICO conspiracy, the jury was instructed:
 To prove that a defendant was a member of the racketeering conspiracy charged in Count 1, the government need not prove that he agreed to personally commit or actually committed any racketeering acts. The government must prove that he agreed to the commission of two or more of those acts by any member of the conspiracy to further the criminal goals of the enterprise, Omni.
 Jt.App. at 1000. After instructing the jury on "racketeering activity" and "pattern of racketeering activity," the district court reiterated, "[i]nsofar as each of the three defendants in this case is concerned, the government must prove beyond a reasonable doubt that he agreed to the commission of at least two of the racketeering acts charged as to him in paragraph 4 of Count 1." Id. at 1002. While this latter instruction is ambiguous and could be read to imply that each defendant must agree to personally commit the racketeering act, we believe, based on the jury instructions as a whole, that this jury would not have so construed it. United States v. Pflaumer, 774 F.2d 1224, 1233 (3d Cir.1985), cert. denied, 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986); United States v. Palmeri, 630 F.2d 192, 201 (3d Cir.1980), cert. denied, 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616, 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 819 (1981). If it were construed to require the commission of at least two racketeering acts by each member of the conspiracy it would be erroneous. So construed, however, it prejudiced the government, not these defendants, and would be considered a harmless overcharge. Ford Motor Co. v. Mathis, 322 F.2d 267, 274 (5th Cir.1963). As such, it would not constitute plain error. United States v. Piccolo, 835 F.2d 517, 519 (3d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). Neither the government nor defense counsel objected to the charge. Jt.App. at 1021. " '[I]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' " Palmeri, 630 F.2d at 201 (quoting Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977)). The same analysis applies to the district court's intimation in its charge that the jury had to find actual receipt of concealed payments.
 
 
 [18]
 Zauber was also convicted separately of a Sec. 1954 substantive violation under Count Six of the redacted indictment
 
 
 [19]
 We note that there is no direct evidence that any of the defendants actually received any kickback payments. Judge Gerry acknowledged this at the sentencing hearing. He also correctly noted that, with respect to conspiracy, actual receipt was not "an essential or necessary finding of the jury." Jt.App. at 1108
 
 
 [20]
 Appellants also raise the following issues on appeal: (1) the jury was incorrectly charged on what constitutes a "pattern" under RICO; (2) the government's decision to maintain the indictment and bring charges that could not be proven constituted prosecutorial misconduct; (3) the overbroad indictment permitted the government to introduce substantial amounts of prejudicial evidence; (4) the government failed to prove a single conspiracy; (5) the government's use of rebuttal summation to refer to an address book entry corroborating testimony about the second lunch meeting at "Paul and Jimmy's," when the address book was not specifically referred to by Higgins on direct or cross-examination, was error and the district court's corrective instruction did not cure its prejudicial effect; (6) the government during rebuttal summation improperly referred to defendants' failure to take the stand; (7) during rebuttal summation the government improperly suggested that defendants were involved in a prior kickback scheme with Friedland, even though the government had stipulated their non-involvement; (8) the cumulative effect of these errors made at the end of trial was prejudicial and warrants a new trial; (9) the district court erred in admitting the "Marlin Stipulation" regarding Friedland's prior conviction into evidence, and this error prejudiced appellants; (10) the district court erred in denying appellants' motions for a bill of particulars and severance; and (11) the cumulative effect of all errors warrants a new trial. Coar also argues (12) that he was not a "person" chargeable in the Sec. 1962(c) conspiracy because it was not shown he was "associated with" Omni, and the district court therefore erred by not acquitting him. Zauber argues (13) that his conviction on Count Six was impermissibly tainted by prejudicial spillover and (14) that the government's introduction of evidence relating to his financial condition deprived him of a fair trial
 Finally, appellants appeal the district court's denial of their Fed.R.Crim.P. 33 motion. That motion alleged that the government's improper referral to Higgins's address book during rebuttal summation violated appellants' constitutional rights. It also alleged that the government used that evidence to corroborate the second lunch meeting at "Paul and Jimmy's" in New York when the government knew, from pre-marked exhibits not introduced as evidence, that Higgins was in Florida on the date of the alleged lunch meeting. That Rule 33 motion was filed in the district court after an appeal was taken to this court. We held the appeal pending the district court's resolution of the motion. The appeal of the district court's denial of the motion has been joined with the original appeal and is currently before us.
 We have carefully considered these arguments and find them not to constitute reversible error.