**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Frank RUNNELS, Defendant–Appellant.**

**No. 86–1923.**

United States Court of Appeals, Sixth Circuit.

Reargued Dec. 7, 1988.

Decided June 13, 1989.

William J. Weinstein, argued, Joel L. Hoffman, Southfield, Mich., for defendant-appellant.

Keith E. Corbett, Asst. U.S. Atty., argued, Detroit, Mich., for plaintiff-appellee.

Before ENGEL, Chief Judge, KEITH, MERRITT, KENNEDY, MARTIN, JONES, KRUPANSKY, WELLFORD, MILBURN, GUY, NELSON, RYAN, BOGGS and NORRIS, Circuit Judges, and EDWARDS and LIVELY,* Senior Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

The question presented to this en banc court is whether the decision in *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), requires us to reverse the mail fraud conviction of defendant, Frank Runnels. For the reasons set forth herein, we conclude that it does.

---

\* The Honorable Pierce Lively became Senior Circuit Judge effective January 1, 1989.

1. The other attorney, Peter Barbara, was not indicted in return for testifying against Runnels. Shapero proferred a conditional Fed.R.Crim.P. 11 plea to mail fraud in February of 1986. The terms of the plea bargain allowed Shapero to appeal the mail fraud charge on the grounds that it was legally defective. At the time of trial, the court had not yet accepted Shapero's plea but did so shortly thereafter. At trial, Shapero was one of the government's key witnesses against Runnels. Shapero subsequently appealed and his conviction was reversed by this court in a decision reported at 842 F.2d 909.

## I.

On January 16, 1986, Frank Runnels was charged in a two-count indictment with a violation of 18 U.S.C. § 371 (conspiracy to commit mail fraud) and 18 U.S.C. § 1341 (mail fraud). Runnels was the president of Local 22 of the United Automobile Workers (UAW). The scheme charged involved the steering by Runnels of workers' compensation claims of retired auto workers to attorney Arnold Shapero and another attorney.[1] In return for up-front money, as well as a monthly payment, Runnels would allow Shapero to attend the monthly luncheon for new retirees. Runnels would indicate to the retirees that Shapero and his law firm were the recommended attorneys for Local 22. The retirees would have their "right" to file post-employment workers' compensation claims explained to them and, at least indirectly, were encouraged to file such claims. Hundreds of claims were in fact filed.

The government proceeded against Runnels on an "intangible rights" theory. Specifically, the indictment charged that Runnels engaged in a scheme "to defraud the members of Local 22, United Auto Workers, of the right to have the business of Local 22 conducted honestly, fairly, impartially, free from corruption, collusion, partiality, disloyalty, dishonesty and fraud." (App. 7). In proceeding under an intangible rights theory, the government relied on cases from other circuits which declared that the mail fraud statute was broad enough to encompass more than deprivations of economic or property interests.[2]

---

2. *See, e.g., United States v. Boffa,* 688 F.2d 919, 931 (3d Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983) (right of union members to honest and faithful services of union officials); *United States v. Margiotta,* 688 F.2d 108, 121 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983) (rights of citizens to have government conducted honestly and free from corruption and fraud); and *United States v. Curry,* 681 F.2d 406, 411 (5th Cir.1982) (chairman of citizens' political action organization owed a duty of faithful service to the committee and of honest financial disclosure to the state).

Runnels challenged the indictment by filing a motion to dismiss. This first motion to dismiss did not address the "intangible rights" theory but, rather, argued that if any money was taken it was not money belonging to the union members. The government's response indicated that it was not union members' money that was at issue but the members' intangible right to an honestly administered union. Runnels then filed a reply and, for the first time, made the argument he would continue to urge throughout these proceedings that the intangible rights theory only applied to public officials. The district court rejected this argument and denied the motion to dismiss. The court ruled that when there was a fiduciary duty owed under the law (as there was between a labor leader and his union members), the intangible rights theory could be applied notwithstanding that the fiduciary was not a public official.

The district court also supported its denial of defendant's motion to dismiss by making an argument not raised or addressed by the parties. The court stated that even if an intangible rights theory would not lie against a union official, the membership may have been deprived of a *tangible* right. The court stated that "had the attorneys not been required to pay defendant, they might have been able to charge lower fees to union members." (App. 61). At the time, this language went unnoticed since it was not necessary to a resolution of the motion to dismiss but, as will be seen, later took on particular importance.

Runnels then proceeded to trial and was found guilty by a jury on both counts of the indictment. Runnels' arguments as they related to the intangible rights theory were legal arguments that were addressed only to the court. At trial, for jury consumption, Runnels' defense was that he took no money from either Barbara or Shapero and was only acting in the interests of his membership in seeing that they had good legal representation easily available to them. Runnels also attacked Barbara as a convicted felon and Shapero as a person who had cut a deal with the government and would testify accordingly. As to these contentions, it can only be said that the evidence at trial that Runnels took money was overwhelming.

After trial, Runnels filed a motion for a new trial and for judgment of acquittal. Fed.R.Crim.P. 29(c). Although a number of issues were raised in the motion, the only one of significance for purposes of this appeal concerns the reiteration of the argument that the intangible rights mail fraud theory was not applicable to this kind of case. The government responded, as it had earlier, by citing considerable case authority in support of its intangible rights theory.

While this motion was pending, this court issued its decision in *United States v. Gray,* 790 F.2d 1290 (6th Cir.1986). This was the first case in this circuit dealing with the intangible rights theory and, as had other circuits, we acknowledged the propriety of a mail fraud prosecution proceeding on an intangible rights theory. In doing so, however, we used some language which appeared to give support to Runnels' theory of defense:

> Within the above context, the "intangible rights" theory is anchored upon the defendant's misuse of his public office for personal profit. "This doctrine of the deprivation of honest and faithful service has developed to fit the situation in which a public official avails himself of his public position to enhance his private advantage...." *United States v. Dixon,* 536 F.2d 1388, 1400 (2d Cir.1976). Conversely, misconduct of a fiduciary in the administration of exclusively private matters in his capacity as a *private individual* which does not involve the misuse of public office or public trust, is not actionable as a violation of the mail fraud statute under an intangible rights theory. *United States v. Rabbitt,* 583 F.2d 1014, 1024 (8th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

*Gray,* 790 F.2d at 1295 (emphasis added).

The district court denied the motions for new trial and judgment of acquittal. The trial judge, correctly in our opinion, read *Gray* to have no effect on the doctrine that

the intangible rights theory was "applicable to non-public officials where a fiduciary duty is involved." (App.158). Runnels then filed this appeal and essentially raised the same "trial error" and "intangible rights" issues that he raised in the district court.

While this appeal was in process, the Supreme Court granted certiorari in *Gray* (*McNally v. United States*, 479 U.S. 1005, 107 S.Ct. 642, 93 L.Ed.2d 698 (1986)).[3] A panel of this court subsequently heard oral argument in Runnels' appeal on May 8, 1987. The *McNally* decision had not been issued by the Supreme Court although oral argument had been heard. One might think under these circumstances that a discussion of the *McNally* case or at least speculation about its outcome would have dominated oral argument. Such was not the case. Runnels' counsel at oral argument only addressed the public/private dichotomy of the intangible rights theory briefly and concentrated the bulk of his argument on the issue of whether the mailing of the forms to the Workers' Compensation Bureau in Lansing, Michigan, was the type of mailing which would satisfy the mailing requirement of the mail fraud statute.

The government reiterated its consistent position that the intangible rights theory was applicable to breach of fiduciary duties whether public or private figures were involved. As to the *Gray* (*McNally*) case, the government's only comments were:[4]

> [T]he *Gray* case is not dispositive in one way or the other of the issues before this court. The *Gray* case dealt with public officials and it dealt with the question as to ... the way you charge a public official with the deprivation of intangible rights ...

If either party anticipated that the intangible rights doctrine was itself in jeopardy in *McNally*, they did not share such speculation with this court. Neither did the panel ask specific questions relating to the status of this case if the intangible rights doctrine should fall. The case was taken under advisement and on June 24, 1987, the Supreme Court decision in *McNally* issued. *Gray* was reversed and the death knell for the intangible rights doctrine was sounded:

> Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has.

*McNally*, 483 U.S. at 360, 107 S.Ct. at 2881.

On October 19, 1987, the panel decision issued in this case. Although the panel acknowledged that a conviction based on an intangible rights theory would not stand, the panel, with one judge dissenting, went on to rule:[5]

> However, as we hold that the jury necessarily found that Runnels, in breaching his fiduciary duty to Local 22 by taking a bribe, violated 18 U.S.C. § 1341 by depriving Local 22 of an economic benefit which properly belonged to it, we affirm these convictions.

*United States v. Runnels*, 833 F.2d 1183, 1184 (6th Cir.1987).

Upon rehearing en banc, we find it unnecessary to address the "economic benefit" theory developed by the panel since we conclude that the only theory on which the government indicted and prosecuted Run-

---

**3.** McNally was a co-defendant of Gray and both appealed.

**4.** All oral arguments are recorded and copies of the recordings are available to the parties and the court.

**5.** Although *McNally* was decided after defendant's trial, there is no question that it must be applied in this appeal. *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649

(1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past.") *See also, United States v. Asher*, 854 F.2d 1483, 1487 (3d Cir.1988) (applying *McNally* retroactively to a mail fraud prosecution on appeal).

nels was the intangible rights theory.[6] Since *McNally* makes a prosecution on such a theory no longer tenable, we reverse.[7]

## II.

The procedural history of this case has been set forth at some length because of the unusual posture in which it comes before our en banc court. Since *McNally* was not decided until after this case was initially briefed and argued, the parties have not, heretofore, addressed the impact of *McNally* on this prosecution. Beyond peradventure *McNally* disposes of any intangible rights aspect of the prosecution. The question remaining is whether the government actually proceeded against Runnels initially on two theories, one of which remains viable. We conclude that it did not.

Although we stop short of accusing the government of being disingenuous in its en banc argument, we do note that prior to Judge Boggs's formulating the economic benefit theory in the original panel opinion, the government never advanced such a contention. The first time the government was asked to address the "two theories" argument was after our original panel decision issued. It is hard to blame the government for trying to come through the door we opened for them. The fact of the matter is, however, the government was given an opportunity early on in this case to advance a two-theory argument and rejected such an approach. It is too late now to make such an argument and as we will discuss further, the decision in *McNally* precludes such an argument being made in the context of this particular case and the indictment upon which it was predicated.

The words "intangible rights" appear neither in the mail fraud statute nor the indictment issued in this case. At the time this indictment was returned, this particular judicial gloss on the mail fraud statute was relatively new. Indeed, it appears that Runnels did not initially comprehend that "intangible rights" was the government's theory since his first motion to dismiss was based on no *property* loss to the union members. It was only after the government filed its response brief to the motions to dismiss that "intangible rights" by that name was specifically implicated and indicated to be that which constituted the loss suffered by the union members. Significantly, however, the government did not argue that the union members had also suffered a property loss. In its response brief the government stated:

> The government is not alleging that this defendant violated any laws of the State of Michigan. The indictment is focused upon the conduct of the defendant which constituted a deprivation of "intangible right[s]" of members of Local 22. Indeed, the evidence will show that when threatened with action which would reveal the motive of his financial relationship to Arnold Shapero, Runnels took immediate action to keep the arrangement secret. The indictment in this case properly states a violation of law in that it charges that [sic] the defendant with conspiracy to deprive the members of Local 22 of their right to have business conducted "honestly, fairly, impartially, free from corruption, collusion, partiality, disloyalty, dishonesty and fraud." Under applicable federal law, this is sufficient to make out a violation.

This same theme is sounded in the district court's opinion denying the motion to dismiss:

> There are two categories which can constitute a scheme to defraud for purposes of this statute. The scheme to

---

6. Although under Rule 14 of the Sixth Circuit the "effect of the granting of a rehearing *en banc* shall be to vacate the previous opinion and judgment," it is necessary to refer to the previous opinion since this en banc rehearing was not predicated on the parties' arguments but, rather, on the panel's resolution of this appeal.

7. We do note, however, that at least three circuits have rejected this economic benefit (constructive trust) theory. *See United States v. Zauber*, 857 F.2d 137 (3d Cir.1988); *United States v. Shelton*, 848 F.2d 1485 (10th Cir.1988); *United States v. Ochs*, 842 F.2d 515 (1st Cir.1988); *United States v. Holzer*, 840 F.2d 1343 (7th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2022, 100 L.Ed. 2d 608 (1988).

defraud can either be to deprive one of a tangible economic interest (e.g., money or property) or an intangible right or interest. *United States v. Richter,* 610 F.Supp. 480 (D.C.Ill.1985). The indictment here charges defendant with intangible fraud, i.e., "the right to have the business of Local 22 conducted honestly, fairly, impartially, free from corruption, collusion, partiality, disloyalty, dishonesty and fraud".

The district judge then concluded by stating:

> First, defendant's argument entirely misses the point. The government has not alleged that defendant defrauded the union members out of a tangible right (i.e., money). Rather, the government has alleged that defendant breached an intangible duty of honesty and good faith, etc. Thus, the fact the money that defendant received did not come directly from the union members is irrelevant. Defendant still had a duty to disclose his relationship with the law firms to the union members.

Although, as we pointed out earlier, the district judge went on to presage Judge Boggs's economic benefit analysis, it was not the basis of the court's decision and it certainly was not the government's theory even after the district judge alluded to it. For example, in its response to the defendant's post-verdict written motion for judgment of acquittal, the government stated in its brief:

> Under these circumstances, the jury was clearly entitled to reach the conclusion that Runnels had participated in a scheme to deprive the members of Local 22 of their right to have the business of the Local conducted honestly, fairly and in the best interest of the members.

The government's argument was accepted by the district court when it denied the motion for judgment of acquittal:

> Defendant seems unwilling to accept or acknowledge that the mail fraud statute can apply to intangible harms where a fiduciary duty is involved. There is no question that Mr. Runnels owed the union members a fiduciary duty. Thus, application of the intangible rights theory to this case was proper.

There was absolutely no mention of "property rights" by anyone at this point when the trial was over and the jury had reached its verdict.

Clearly, however, the most conclusive and damaging evidence on the question of whether the government had relied on a property rights theory in this case is to be found in the oral arguments made by the parties in connection with Runnels' oral motion for judgment of acquittal after the government rested its case-in-chief. At the beginning of his argument Runnels' counsel stated:

> MR. WEINSTEIN: [I] think we can agree in this case without argument by anyone that there is no evidence in this case of a tangible loss to any union member of Local 22 UAW or a tangible loss to the union itself. There were no funds in this case—

> THE COURT: What about the loss to the union member of his right to know that an attorney—making the assumption this actually took place—that his attorney was sending money back per case. Might not the union member had he known this either got a discount or a rebate from the attorney?

(Tr. 352–353).[8] This was now the second time the court had come to the assistance of the government by offering a theory that would implicate the loss of tangible rights. However, this time the govern-

---

**8.** Note the similarity between this conjecture by the court and the language of footnote 3 of the original panel decision:

> Nonetheless, Runnels argues that Local 22 was not harmed, because its members received their full workers' compensation and the attorneys' fees were limited by state law and set by a state agency. The assumption underlying this argument, that the choice of a

lawyer had no economic value, is belied by the facts. Shapero was willing to pay, and paid, $2,000 per month to ensure that Runnels would steer work from members of Local 22 to his firm. That money should have gone to the union members, not Runnels. Runnels could have negotiated a lower fee for the members of Local 22.

*Runnels,* 833 F.2d at 1186 n. 3.

ment flatly and unequivocally rejected this alternate argument. In responding to the motion to dismiss, the prosecution stated:

[MR. CORBETT]: It is the Government's position, I think the Court's questions towards Mr. Weinstein [were] leveled at the Government's essential position, that you may have two types of rights addressed or attacked by virtue of a scheme or artifice to defraud, one an economic right and deprivation of some sort of economic right.

The Government has not alleged that in this case. What the Government alleged in this case is that Mr. Runnels by virtue of his position as a UAW official owed an intangible right, but a very real right nevertheless despite the fact it's not tangible to the members of Local 22 and that that right was the right to have the duty of the Local conducted fairly, honestly and impartially.

(Tr. 389). Shortly thereafter, the prosecution went on to state:

[MR. CORBETT]: In light of those facts I submit to the Court it's the Government's position that intangible rights, i.e., fair, honest, faithful services on the part of Mr. Runnels clearly, in light of the Boffa, Curry and Barta case clearly come within the ambit of the mail fraud statute. For purposes of this motion that evidence taken in view in the light most favorable to the Government at this point in time clearly provides the Government with sufficient information to proceed before a jury and proceed with the case.

(Tr. 394).[9] The court then denied the oral motion from the bench immediately at the conclusion of counsels' arguments. In one terse phrase the district judge stated:

All right. The Court will deny the motion for acquittal under Rule 29. The Court has previously entered an opinion outlining its feelings that non-economic losses may be the subject of mail fraud.

(Tr. 396).

If anything further is needed to demonstrate that the government indicted and proceeded against Runnels only on an intangible rights theory, it is to be found in the closing argument of the prosecutor. In order to understand the government's argument, one must hark back to the observation made earlier that Runnels' jury strategy did not parallel his legal arguments to the court. Since his whole defense before the jury was that Runnels did not take any money, it is understandable that most of the government's closing argument was directed at demonstrating that Runnels took bribes. It was only near the end of its closing argument that the government even addressed its theory of the case when the prosecution stated:

[MR. CORBETT]: Frank Runnels was President of Local 22 of the United Automobile Workers, the auto workers, and in connection with that he had an obligation, a duty. He had a responsibility to his members. What was that obligation? What was that duty? What was that responsibility? You heard the indictment, ladies and gentlemen. The government contends that Mr. Runnels had a duty to represent his members fairly, impartially, honestly, free from corruption, collusion and dishonesty. That was his job to be a good union leader, to represent the people that he was elected to represent.

(Tr. 452). One cannot fault the government for the strategy reflected in its closing argument. The defense had put all its eggs in the "I didn't do it" basket, and it was fairly predictable that if the jury believed Runnels had taken money, there would be a conviction regardless of the theory under which the government was proceeding.

Finally, the jury instructions also reflect the fact that this was solely an intangible rights theory prosecution. After using the standard boiler-plate language found in all mail fraud jury instructions, the trial judge defined the specific elements the jury must find in this case as follows:

---

**9.** We note also that although two of the government's three witnesses were the attorneys who paid bribes to Runnels, they were not asked any questions concerning whether they might have offered a reduced fee to the union members if they had not been paying off Runnels.

The essential elements of the offense charged in Count Two:

1. That the scheme or artifice to defraud described in the indictment was willfully devised and was existing at or about the time alleged;

2. That the defendant willfully and knowingly devised or participated in the scheme to defraud and deprive the members of United Auto Workers, Local 22, of their right to have Frank Runnels conduct the business of the United Auto Workers, Local 22, honestly, fairly, impartially, free from corruption, collusion, partiality, disloyalty, dishonesty, fraud, or willfully and knowingly became a member of the scheme to defraud;

3. That the defendant or some other member of the scheme to defraud used the United States Postal Service by taking or receiving, or by causing to be taken or recieved, some matter or thing from the mails for the purpose of executing the scheme to defraud;

4. That the defendant acted with specific intent to defraud.

(Tr. 547–548). The words "scheme" and "artifice" used in the above quoted jury instructions were defined for the jury in the following language:

The words "scheme" and "artifice" as used in the statute just read, include any plan or course of action intended to deceive others, and to deprive the members of United Auto Workers, Local 22, of intangibles such as their right to have Frank Runnels conduct the business of the United Auto Workers, Local 22, honestly, fairly, impartially, free from corruption, collusion, partiality, disloyalty, dishonesty and fraud.

(Tr. 546–547). The jury instructions are totally devoid of any reference to any tangible or property loss suffered by the union members or others. Under such circumstances the analysis of post-*McNally* cases suggested by the Third Circuit in *United States v. Asher*, 854 F.2d 1483 (3d Cir.1988), is worth noting:

In the wake of the Court's decisions in *McNally* and *Carpenter* [*v. U.S.*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987)], a significant number of pre-*McNally* criminal convictions have been challenged on the ground that they were based on the now outlawed intangible rights doctrine. In response to these challenges, the courts of appeals have sought to analyze and apply *McNally* and *Carpenter* within an appropriate framework. Those cases in which a conviction was based entirely on the intangible rights theory of mail fraud, and in which the instructions to the jury could not assure that money or property interests were implicated, have been overturned on *McNally's* authority. *See, e.g., United States v. Conover*, 845 F.2d 266 (11th Cir.1988); *United States v. Ochs*, 842 F.2d 515 (1st Cir.1988); *United States v. Holzer*, 840 F.2d 1343 (7th Cir. 1988); *United States v. Matt*, 838 F.2d 1356 (5th Cir.1988); *United States v. Covino*, 837 F.2d 65 (2d Cir.1988); *United States v. Murphy*, 836 F.2d 248 (6th Cir. 1988); *United States v. Gordon*, 836 F.2d 1312 (11th Cir.1988); *United States v. Cooke*, 833 F.2d 109 (7th Cir.1987); *United States v. Gimbel*, 830 F.2d 621 (7th Cir.1987); *United States v. Herron*, 825 F.2d 50 (5th Cir.1987).

854 F.2d at 1490.

The court was able to sustain the mail fraud conviction in *Asher* because it found the government had proceeded under and *offered evidence* in support of a theory which resulted in "every aspect of the charged crime considered by the jury involv[ing] some potential tangible loss to the Commonwealth." *Id.* at 1496.

Closer to the facts in our case are those bottoming the decision in *United States v. Conover*, 845 F.2d 266, 271 (11th Cir.1988). Conover and Tanner were employees of the Seminole Electric Cooperative, Inc., who made misrepresentations to the Rural Electrification Administration (REA) relative to proper bid procedures being followed by Seminole in awarding road construction contracts. In a mail fraud indictment they were charged and convicted of defrauding their employer of the right to honest and faithful service.

Post-*McNally*, these convictions were reviewed and reversed. In reversing, the court stated:

> On the basis of *McNally*, it is inferable that to sustain the convictions in this case, the Government would have to offer proof and the jury would have to be instructed that Seminole would have paid less for the road or received a higher quality road. These points were not brought out at the trial. There was some testimony that Seminole paid a slightly higher price for Tanner's sand filling. However, it is not evident in the indictment or in the charge that Seminole paid a higher price for the patrol road, or that the patrol road was constructed improperly. Additionally, there is no instruction providing that Conover's compromise of his company's interests caused losses of money or tangible property to Seminole.

*Conover*, 845 F.2d at 271.

The point made by *Conover* is a point that has direct application here. The issue is not what a defendant might have been charged with, but what he was charged with.

The Eleventh Circuit has also very recently decided a post-*McNally* intangible rights case. *United States v. Dynalectric Co.*, 859 F.2d 1559 (11th Cir.1988). The court was able to affirm the conviction on the basis of concluding that the government had proceeded on two theories—one involving intangible rights and the other money. However, in *Dynalectric*, unlike the case here, the government clearly charged the taking of money as a part of the offense:

> The indictment charged that:
>
> 23. Beginning in or about August 1979 and continuing thereafter until at least January 1985, the exact dates being unknown to the Grand Jury, the defendants and co-conspirators devised and intended

to devise a scheme and artifice to defraud the County and the United States of America, through its agency, the EPA, of:

> (a) money; and
>
> (b) their right to free and open competition for the bidding on the electrical construction portion of the Snapfinger Creek project, such bidding to be conducted honestly, fairly and free from craft, trickery, deceit, corruption, dishonesty and fraud.
>
> 24. It was part of the aforesaid scheme and artifice to defraud that the defendants, and others, known and unknown to the Grand Jury, would and did submit collusive, artificially high and rigged bids in order to induce the general contractor selected to build the Snapfinger Creek project to award the subcontract for the electrical construction portion of the project to defendant Paxson Electric.
>
> The plain language of the indictment charges the defendants with scheming to defraud the EPA and Dekalb County of *money*. While it also charges that the defendants schemed to defraud the victims of their right to open competition, the indictment is not worded in a way that would allow the jury to choose between the two theories. Rather, to convict the defendants in accordance with the indictment, the jury must have concluded that there was a scheme to defraud the victims of money *and* the right to open competition.

*Id.* at 1572 (footnote omitted).[10]

Implicit (but certainly not explicit) in the government's belated "two-charge" argument in the case at bar is the suggestion that the indictment charged a scheme (a) to defraud and (b) to obtain money by false and fraudulent pretenses (App. 7), implying that these were two different schemes, the one involving intangible rights and the other involving property rights. Apart from

---

**10.** The government cites to *United States v. Perholtz*, 842 F.2d 343, 366 (D.C.Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988). *Perholtz* is a post-*McNally* case involving a prosecution for RICO and mail fraud violations. The court salvages the mail fraud conviction by concluding that the findings made

on the RICO count would of necessity have been adequate to also support a mail fraud conviction. Without indicating our agreement or disagreement with the conclusions reached in *Perholtz*, it is clear that it is distinguishable on its facts.

the fact that the government never even hinted at this argument prior to our earlier panel decision, it suffers from several problems. To begin with, it does nothing more than track the language of 18 U.S.C. § 1341 which reads in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

This is the standard boiler-plate language used by the government in mail fraud prosecutions. More importantly, however, in *McNally* the Supreme Court specifically rejected the notion that the concept of "defrauding" or "obtaining money by false pretenses," although phrased in the disjunctive, represented two different types of charges:

> After 1909, therefore, the mail fraud statute criminalized schemes or artifices "to defraud" or "for obtaining money or property by means of false or fraudulent pretenses, representation, or promises...." Because the two phrases identifying the proscribed schemes appear in the disjunctive, it is arguable that they are to be construed independently and that the money or property requirement of the latter phrase does not limit schemes to defraud to those aimed at causing deprivation of money or property. This is the approach that has been taken by each of the Courts of Appeals that has addressed the issue: schemes to defraud include those designed to deprive individuals, the people or the government of intangible rights, such as the right to have public officials perform

their duties honestly. See, *e.g.*, *United States v. Clapps*, 732 F.2d 1148, 1152 (CA3 1984); *United States v. States*, 488 F.2d 761, 764 (CA8 1973).

As the Court long ago stated, however, the words "to defraud" commonly refer "to wronging one in his property rights by dishonest methods or schemes," and "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). The codification of the holding in *Durland* [*v. U.S.*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896)] in 1909 does not indicate that Congress was departing from this common understanding. As we see it, adding the second phrase simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property.

*McNally*, 483 U.S. at 358–59, 107 S.Ct. at 2880–81 (footnote omitted).

Thus, one must read the indictment as charging Runnels with obtaining money for himself by devising a scheme which resulted in depriving the union members of their right to an honestly-run union. This clearly is an intangible rights theory.[11]

It is unfortunate indeed that a conviction has to be reversed in a case in which the evidence so clearly established wrongful conduct on the part of the defendants.[12] We concur in the observation made by the Eleventh Circuit in *Conover* when it was forced to reverse a mail fraud conviction as a result of the decision in *McNally*:

> At the time they acted for their personal gain their actions were clearly unlawful. The law is an ever-changing body, however. The Government's attorneys cannot be blamed for proceeding as they did given the state of the law.

*Conover*, 845 F.2d at 271.

REVERSED and the judgment of convic-

---

**11.** Even in a "two-theory" indictment, due process problems may be presented when the government proceeds in furtherance of a single theory only. *See, e.g., United States v. Castillo–Felix*, 539 F.2d 9 (9th Cir.1976).

**12.** We express no opinion as to whether the defendants might be re-indicted under some alternate theory.

tion is VACATED.[13]

KEITH, Circuit Judge, concurring.

I concur fully in Judge Guy's excellent majority opinion. As Judge Guy aptly demonstrates, upon review of (1) the government's response brief to Runnels' motions to dismiss; (2) the government's response brief to Runnels' motion for judgment of acquittal; (3) the government's statements made during oral argument on Runnells' motion for judgment of acquittal; and (4) the government's closing argument, it is readily apparent that the government simply did not proceed on any theory other than a deprivation of "intangible rights." Moreover, as Judge Guy also points out, the government never offered the "economic benefit" theory until that theory appeared in the opinion by the original panel. I write separately only to make it clear that I do not at all find it difficult "to blame the government for trying to come through the door we opened for them."

Whether or not the original panel advanced a "two theories" argument in its opinion is not relevant to the government's attempt to offer such an argument at this juncture. The government, after all, was in the best position to know on which theories the case, in fact, proceeded. Moreover, the prosecution of criminal cases is not a game in which the government "wins" by preserving convictions by any means which present themselves. Instead, the government has an affirmative obligation to both fairly state the record and to argue the law in good faith. Indeed, the government's responsibility in this area is even greater than that of other litigants. The government prosecutor, as a proxy for the community, is charged with representing the principles which are as important to society as convicting the guilty, if not more so. The admonition of Justice Sutherland that "while [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones," *Berger v. United States*, 295

U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), applies as forcefully to appeals as it does to trials. While the government's decision to proceed strictly on the then viable "intangible rights" theory cannot in any way be faulted, its post-hoc argument that this case proceeded on two theories is not excusable.

BOGGS, Circuit Judge, dissenting.

Frank Runnels, a high union official, was indicted on charges of mail fraud and conspiracy to commit mail fraud. The indictment very specifically charged that the offense was participating in a "scheme or artifice to defraud ... intended ... (b) to obtain money by means of false and fraudulent pretenses and representations...." The indictment further charged specifically that the scheme involved the payment of $50,000 to Runnels to secure his services in touting to his members the services of the law firm that was paying the money. The indictment also recounts specific payments made to Runnels.

Subparagraph (a) of the section quoted above charged that the scheme or artifice was intended to defraud the members of their right to honest conduct of the union's business. Thus, on the face of the indictment and the specific acts set forth, the government alleged both a deprivation of intangible rights and a specific obtaining of money by false and fraudulent pretenses.

The court's opinion posits the question before the court as whether the Supreme Court's decision in *McNally* requires us to reverse the mail fraud conviction. This dissent agrees that, *given the trial as conducted and the instructions as given*, *McNally* requires a reversal. However, the court's opinion goes on to take the position that *McNally* means that no one who committed the actions Runnels did could be convicted on the indictment in this case. That extension, I believe, is unwarranted. The record shows that the indict-

---

13. Although we discuss only the substantive mail fraud count, the government has never suggested that the conspiracy count might somehow survive. Indeed, in *McNally* which also involved an indictment charging a conspiracy and a substantive count, the government conceded that if the substantive count fell, the conspiracy count must also fall. We believe that to be the correct result here.

ment as presented was legally sufficient, and that the basic facts put in evidence would, if properly argued and instructed upon, support a conviction. I therefore respectfully dissent from the court's action requiring the dismissal of the indictment.[1]

I

The Supreme Court in *McNally*, as correctly cited by the court at pages 19–20, held that the mail fraud statute, in proscribing schemes " 'to defraud' or 'for obtaining money,' " only meant to include one type of charge: " 'wronging one in his property rights....' " 108 S.Ct. at 2880. Courts had earlier held that the statute could be read as banning schemes "to defraud" (including intangible rights) *or* "to obtain property" (tangible rights). See *e.g.*, *United States v. Clapps*, 732 F.2d 1148, 1152 (3rd Cir.1984); *United States v. States*, 488 F.2d 761, 764 (8th Cir.1973). Thus far, the court is correct. This does not mean, however, that each and every indictment mentioning intangible rights must be construed to have meant intangible rights only, no matter what the indictment says. In fact, the *Dynalectric* case, cited by the court (page 489) as involving an adequate indictment, is specifically an indictment that alleges a defrauding of "(a) money; and (b) [the] right to free and open competition...." *United States v. Dynalectric Co.*, 859 F.2d 1559, 1572 (11th Cir. 1988). The indictment here is, in essence and in structure, of the same type. It alleges a scheme to defraud, intended (a) to defraud of intangible rights and (b) to obtain money by false and fraudulent pretenses. At page 19, the majority suggests that this "tangible rights theory" still rests on distinguishing between (a) schemes to defraud and (b) obtaining money by false pretenses. This is not so. What Runnels

did was to have a scheme to defraud whereby he obtained money by false pretenses. By acting faithlessly in his fiduciary capacity, he did obtain money and did defraud his union members.[2] Contrary to the court's holding at page 490, this is not solely an intangible rights theory. A person may simultaneously deprive another of both honest services and money that belongs to another.

The court also argues that paragraph 1(b) is "only boiler plate" (but of course boiler plate pleading in the pleading of a crime in the terms of the statute is perfectly permissible) and that 1(b) is solely a description of the result intended by the defrauding of intangible rights. I do not think a sensible reading of the indictment will support that argument. First, under that theory it is unclear how Runnels's obtaining money from the lawyers can be characterized as obtaining it "by means of false and fraudulent pretenses." The lawyers and Runnels each knew exactly what they were doing. They were in collusion with each other, not committing fraud upon one another. Second, while the court apparently feels that the *Dynalectric*-type indictment would be sufficient, it is not clear why saying "money and intangible rights" is sufficient in *Dynalectric* while saying "intangible rights and money" is insufficient in this case.

It perhaps would have been clear enough even to satisfy the court had the indictment said that the scheme was intended "(a) to defraud of intangible rights *or* (b) to obtain money" (thus achieving sufficient disjunction). However, the government had no reason to say "or", because it had evidence of both. Thus, looking strictly to the indictment, it is not a proper interpretation to read it as meaning simply that money

---

1. I note that this decision may have little continuing impact because of amendments contained in the recently enacted Anti–Drug Abuse Act of 1988 reinstating the intangible rights theory. PL 100–690, § 7603. I also note that the court's opinion does not declare that a reindictment and retrial is impossible, though there well may be both statute of limitations problems and arguments as to double jeopardy problems.

2. 29 U.S.C. Sec. 501 states: "The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group ... to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization."

would accrue to Runnels as a result of an intangible rights violation.

## II

The court discusses extensively various activities during the pre-trial and trial proceedings in an attempt to look back and determine what the words of the indictment meant. However, these discussions relate more to the way the proceedings developed than to the legal force of the indictment as drafted.

The court's own discussion of the first attack by Runnels on the indictment shows that both theories were alive at that point. As the opinion states (page 483): "[t]his first motion to dismiss did not address the 'intangible rights' theory but, rather, argued that if any money was taken it was not money belonging to the union members." This certainly indicates that the tangible rights theory was alive at this point. The district court in its denial of the motion to dismiss properly noted that there were grounds for proceeding to trial on both a tangible and an intangible rights notion, as reported by the court (page 483), quoting the district court.

The court's argument (pages 485–486) that there is something dispositive in the fact that the government and the trial judge responded to post-trial motions by focusing on the viability of the intangible rights theory is completely explained by the fact that defendant's motions only attacked that theory. At page 487 of the majority opinion there is a discussion of what is, perhaps, the government's most compelling admission. The government had rested its case-in-chief, in which it presented ample evidence of the taking of money. In the course of oral give-and-take on a motion for acquittal and responsive to defense counsel's assertion that there was no loss to a member of the local, the government did say that even such a fact would not terminate the case because of the intangible rights theory and that a judgment of acquittal could not be granted unless that theory was negated. Defense counsel did not make any motion for a partial dismissal of the charges, or for an

instruction that embodied this "concession."

While the briefs and arguments in the motion practice before the judge before and after trial are not models of clarity, the government never in any efficacious way renounced or amended any of the charges of the indictment. The language cited by the majority simply indicates that as Runnels attacked the intangible rights theory, the government defended the intangible rights theory.

Whatever the result of this analysis, however, it should not distract from the focus on the indictment itself. It is true that the government, in the heat of responding to arguments attempting to obviate the responsibility of the defendants under the intangible rights theory, itself focused exclusively on that theory. This may explain our reversal of the conviction, because the defendant was not adequately put on notice that he could and should defend against a tangible rights deprivation. However, the government's argument does not alter the language in the indictment or alter what could have been done with that language had the government's strategy led it to seek proper instructions.

Having once determined that the language of the indictment would have been sufficient, there is no reason to support the court's key holding (page 484) that the only theory on which the government indicted Runnels was the intangible rights theory. The opinion virtually concedes as much when it states (page 487) that "if the jury believed Runnels had taken money, there would be a conviction regardless of the theory under which the government was proceeding." This could not possibly be the case unless the indictment adequately charged a defrauding of money actionable under the statute.

## III

While the court does not specifically hold that Runnels could not be prosecuted for use of the mails in the course of a scheme appropriating a benefit that properly be-

longed to his union members, it skirts close to it. The court does note that several circuits have rejected such a theory, at least as it applies to public officials, who are fiduciaries for the entire population of large political units. *See United States v. Shelton,* 848 F.2d 1485 (10th Cir.1988); *United States v. Ochs,* 842 F.2d 515 (1st Cir.1988); *United States v. Holzer,* 840 F.2d 1343 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988). While an expansive reading of *McNally* might lend support to such a result, the unanimous Supreme Court in *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 320–21, 98 L.Ed.2d 275 (1987), indicated its approval of the designation as "property" of a newspaper's fleeting right of prepublication confidentiality. It is extremely difficult to see how the appropriation of money that properly belongs to a principal as a result of a fiduciary relationship is any less a form of property than that involved in *Carpenter.*

In the course of the trial, the government introduced, as the court's opinion concedes, ample evidence that money was given to Runnels. If there was a deficiency in the evidence, it lay in the government's not establishing or explicating Runnels's fiduciary obligations and relationship to the union members. Even so, it is difficult to say that on proper instructions a jury could not have found that Runnels did receive money that belonged to the union members.

The government's concession, of which so much was made at oral argument, was simply that no part of the money was *intended* to go to the union members. That is, Runnels did not divert money that the bribers in this case wanted to go to the union members. Rather, as in many conventional fraud cases, the giver of the money and the defrauder, together, took money that rightly belonged to another.

For a conviction in these circumstances, or for a conviction on retrial, it is not necessary to prove absolutely that the lawyers would have, or could have been in a position to, offer lower prices for their services. Even if the price of the services was absolutely fixed by law, the bribe to Runnels was itself money that belonged to the union members, because of the fiduciary position of Runnels. That money could have been, and should have been, directed to the benefit of the union members, whether by individual rebates, furnishing of additional union services, augmentation of union property or any other means. It is this theory that was available in the indictment, and was, among others, upheld by the district judge in pretrial proceedings, and which, had proper instructions been given, would have been supported by the evidence at trial. Otherwise, *McNally* will have stricken from the mail fraud statute not only the more nebulous public officials' cases, but any use of the mail fraud statute to attack the obtaining of money by faithless fiduciaries.

This is completely inconsistent not only with *McNally* itself but even more with the Supreme Court's decision in *Carpenter,* where the Supreme Court quite easily upheld the conviction of a faithless fiduciary whose connection to actual money of the principal was far more tenuous than here. In the *Carpenter* case the thing of value, of which the principal was deprived, was the possible monetary value of an item of information over a quite limited period of time. If the mail fraud statute addresses such deprivations, it is impossible to understand how, under proper instructions, it would not address the diverting of a specific sum of money to which the principal had a right.

The court's final citation (page 490) from *United States v. Conover,* 845 F.2d 266, 271 (11th Cir.1988), further raises the disturbing implication that Runnels's actions might not violate Federal law at all. The *Conover* citation speaks of releasing defendants whose actions "at the time they acted for their personal gain ... were clearly unlawful," thus implying that such actions are no longer unlawful. As argued above, I do not believe that is the case here. Properly read, the indictment charged a scheme that both deprived others of intangible rights and defrauded others to obtain their money. In our view such an indictment is proper, and could be sustained

by the evidence presented at trial.

Thus, we are left with the familiar situation where during the process of trial and instruction, error has been committed that makes the upholding of a conviction fundamentally unfair. In those circumstances, reversal for retrial is ordinarily the proper remedy, except under *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed. 2d 1 (1978), where evidence is wholly insufficient to support any theory of liability. As indicated above, that is certainly not the case here. The evidence was not only sufficient, it was overwhelming, that Runnels took money, and that he was acting in a fiduciary capacity for the union. As the Supreme Court stated in *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 268, 102 S.Ct. 3081, 3084, 73 L.Ed.2d 754 (1982), even though a defendant has been put to the difficulty of an initial trial, "reversal of the conviction and, where the Double Jeopardy Clause does not dictate otherwise, the provision of a new trial free of prejudicial error normally are adequate means of vindicating the constitutional rights of the accused" (footnote omitted).

## IV

I would hold in this case that the government's initial indictment adequately pled a taking of money by false and fraudulent pretenses, that the district judge was correct in allowing a trial to go forward on that theory, and that a retrial, upon proper instructions, may be had under that indictment.